STREET RAILROAD AND TEL. COMPANIES *v.* SIMMONS.

*(Jackson.* June 22, 1901.)

1. NEW TRIAL. *Extension of term of Court for disposition of.*

The authority conferred by Acts 1899, Ch. 40, upon the Courts of this State to continue and extend any of their terms beyond the time limit fixed by law, and into another and succeeding term at the same or another place for the purpose "of trying, disposing of, and returning verdict and rendering judgment" in cases "pending and on trial by Court or jury undetermined" at the expiration of the term, confers upon the Courts the power to continue and extend their terms for the purpose of disposing of motions for new trial and granting appeals. (*Post, pp. 393–396.*)

Act construed: Acts 1899, Ch. 40.

Code construed: § 6057 (S.); § 4991 (M. & V.); § 4219 (T. & S.).

Case cited and distinguished: State *v.* Sneed, 105 Tenn., 714.

2. SAME. *Misconduct of jury.*

A verdict is vitiated by statements made to the jury by one of their number during their deliberations out of the presence of the Court, which were of a character to prejudice the complaining party, although the jurors testify they were not influenced by same. And such statements may be proved by affidavits of the jurors.' (*Post, pp. 401– 403.*)

Cases cited: Donston *v.* State, 6 Hum., 275; Wade *v.* Ordway, 1 Bax., 240; Morton *v.* State, 1 Lea, 498; Nolan *v.* State, 2 Head, 521; Sam *v.* State, 1 Swan, 61.

3. MASTER AND SERVANT. *Servant's diligence to protect himself.*

The servant of a telephone company, commonly called a lineman, whose duties, *inter alia,* are to put up poles, string wires, put in guy wires, and to repair same and clear the lines of troubles, must inspect and test the wires which he is expected to work; and being engaged in an occupation peculiarly hazardous, and having the better opportunity to discover and avoid the dangers incident thereto, he cannot, without negligence,

Street Railroad and Tel. Companies *v.* Simmons.

assume that wires are properly and safely insulated, but must exercise active diligence to discover defects that may possibly exist. (*Post, pp. 397-408.*)

Case cited: Cumberland Tel. Co. *v.* Loomis. 87 Tenn., 504.

---

FROM MADISON.

---

Appeal in error from Circuit Court of Madison County. R. W. HAYNES, Special Judge.

C. G. BOND and HAYS & BIGGS for telephone and street railroad companies.

R. F. SPRAGINS and BULLOCK & TIMBERLAKE for Simmons.

MCALISTER, J. Mrs. Simmons- recovered a joint judgment against the telephone and street railroad companies, for the sum of $2,500, for the wrongful killing of her husband, R. P. Simmons. Both companies appealed, and numerous errors are assigned.

A preliminary motion is interposed in behalf of the defendant in error to dismiss the appeal, upon the ground that it was granted after the expiration of the term — that is to say, after the term had expired by law. The record shows that the Circuit Court of Chester County begins its fall term on the third Monday in October, and that, in 1900, it should have convened, by law, on October 15. The

motion for a new trial in the present case was made in the Madison Circuit Court on October 12, and, there not being sufficient time to dispose of the motion, it was held under advisement until Tuesday, October 16, when the motion was over-ruled, the appeal prayed and granted, and thirty days allowed to file bill of exceptions. The bill of exceptions was signed October 31, which was within the thirty days allowed by the Court. As already stated, the Chester Circuit Court began, by law, October 15, and the appeal in this case was granted October 16. The insistence now made is that the Circuit Judge had no power or authority to grant the appeal after the expiration of the term. It is agreed that said action of the Court was had three days after the time fixed by law for the adjourn-ment of said Court, and the second day of the term prescribed by law for Chester County. Coun-sel cites, in support of this position, the case of *State* v. *Sneed*, 21 Pickle, 714, in which it appeared that the term of Court in Knox County closed on September 1, and on September 3, when the entries were made, praying and granting an appeal, and giving time to prepare bill of exceptions, the Court was, by law, in Sevierville, Sevier County, and could not be open in Knoxville. This Court held that the action of the Court on September 3 was void and of no effect, and the entry ordered on that day to be made, as of date September 1, was unauthorized and of no effect, etc. In that case, how-

ever, it appeared that, while the judgment was pronounced during the trial term, it was held up, by order of the Court, and no entry thereof was made until after the time for the adjournment of the Knox County Circuit Court and the convening of the Sevier County Circuit Court, when the trial Judge caused an entry of the judgment to be made, *nunc pro tunc*, as of September 1. This entry recited, however, that the prayer for an appeal was not made and granted until September 3. The record thus showed that a judgment was entered September 1, when Court was in session, but no appeal was prayed or granted until September 3, when the Court was not, and could not be, in session. There was no motion for a new trial.

In the present case the motion for new trial was entered on Friday, October 12, partially considered and continued over until Saturday, October 13, and there not being sufficient time to finish it on that day, it was held under advisement until Monday, October 15. On that day it was still unfinished and went over until next day, the 16th, when it was overruled, the appeal prayed and granted. It appears that, during the time the motion for a new trial was pending, the jurors were being examined touching certain charges of misconduct. The Acts of 1899, Sec. 6057, Shannon's Code, provides, viz.: "That whenever, in the Courts of this State, any case is pending, and on trial by court or jury, undetermined at the time, the term at which it is

pending expires on account of time and on account of the arrival of the succeeding term, the term shall be extended and continued into such succeeding term for all the purposes of trying, disposing of and returning verdict and rendering judgment in such case so pending and on trial, the same as if such new term had not arrived." Acts 1899, Ch. 40, p. 35.

We think the motion for a new trial is within the purpose and intendment of this statute, and that so long as the motion for a new trial is being considered by the Court, the case is not disposed of within the meaning of the act. If this construction is not correct, then the statute involves the absurdity of permitting an infringement upon the succeeding term to the extent of finishing a pending trial, but shutting off the motion for a new trial or the right of appeal. This, of course, the Legislature could not do, and if the term is extended for the purpose of finishing the trial, it must be further extended for the disposition of the motion for a new trial and the prayer for appeal. All this, we think, is comprehended within the language "disposing of the case," employed in the statute.

The case of *State* v. *Sneed* is not controlling here, for the reason there was no motion for a new trial pending, or any record entry of any matter which was being considered by the Court touching a pending case. The motion to dismiss the appeal is, therefore, overruled.

The gravamen of the action, as laid in the dec-

laration, is that plaintiff's intestate, R. P. Simmons, at the time of his death, was in the employment of the telephone company, in the capacity of a lineman, and was killed by coming in contact with a live wire of the street car company attached to one of its poles which Simmons had ascended for the purpose of making repairs for the telephone company. It is alleged that, prior to that time, the street car company and the telephone company had entered into a contract, parol or written, by which it was mutually agreed that either company might use the poles of the other in case of necessity or expediency. Again, it is alleged that the street railroad company, by permitting the telephone company to string its wires on the poles in question, made the latter company a licensee, whereby the street railroad company owed a duty to the telephone company and its employees to keep its wires attached to said poles properly insulated. Again, it is alleged that the street railroad company, in carrying on its business and maintaining its system of wires in a public thoroughfare where the poles and wires of other electrical companies were maintained, owed a duty to the employees of the other electrical companies, to keep its wires attached to said poles safely insulated. It is further charged that the defendant telephone company, by stringing one of its wires to said pole, for the purpose of making a return circuit, made said pole part of its appliances and premises, and defendant telephone

company, in not providing safe appliances, and inviting deceased to an unsafe and dangerous place to work, is liable. It is further charged that both companies knew, or ought to have known, that said wire was not insulated and that it was charged with a deadly current of electricity. The facts disclosed in the record tend to show that the deceased, at the time of the accident, was in the service of the telephone company, as lineman and inspector. His duties were of a general nature—that is to say, they were not specifically defined—but the deceased was expected to perform any duties in the line of telephone business that might be demanded of him.

On September 17, 1897, a street car had become derailed, and the trolley pole, in some way, came in contact with the guy wire attached to a pole of the car company, thereby turning the current of electricity from the trolley wire to the guy wire, and, pushing the guy wire up, caused it to come in contact with the lead cable incasing the telephone wires, and burning a hole in the cable. When the derailed car was placed back on the track, the original *status quo* was restored, and there was no further communication between the trolley and guy wires. The telephone company was apprised of the accident, and directed the deceased to proceed to the place and ascertain the cause of the trouble. The deceased, after an examination of the premises, and without especial directions from his superior officers, mounted a pole belonging to the street car

company, ostensibly to raise the lead cable of the telephone company, which was then sagging down, and attach to it a bracket affixed to the street car pole, and, while thus engaged, Simmons was killed by coming in contact with one of the live spur wires of the street car company. The gravamen of the action against the street car company is that it was negligent in only using a single insulator, placed at the connection of the span wire with the trolley wire; and which insulator was itself defective and out of repair, and negligently failing to place a second insulator at some proper and convenient point between the trolley wire and said pole.

There is proof tending to show that no inspection had been made by the street car company, from the time it began operating—April 30, 1897—up to the time of the accident, to see if its said insulator was in good condition. It was insisted that the street car company had at its powerhouse what is termed a current breaker, and that no other test or inspection of insulators was necessary. It is further shown that the street car system had only been in operation in Jackson for about four months; that it was equipped with the best and most modern appliances; that the span wires were attached to the trolley wire by the bell-hanger insulator, which was the latest and most effective appliance for preventing the electrical current from escaping from the trolley wire to the span wire. It is also shown that the company had furnished Simmons with a magneto bell

and test set, in order to enable him to ascertain the presence of an electrical current in any wire, but that he failed to have it with him on this occasion. Whether these instruments were useful only in discovering electrical disturbances on the line, and were not designed to test the insulators and defects therein, or their location, was a question addressed to the superior wisdom of the jury. It is said, however, that a common and very reliable test of the voltage of the wire is to brush it lightly with the hand or with an old piece of iron, and that this test was usually applied by linemen. There is evidence tending to show that, when Simmons first mounted the pole, he touched the wire that afterwards caused his death, but at that time no serious result was experienced. It is said that a defective insulator acts perfectly at one moment, and the next moment will permit a fatal current of electricity to pass over the wire. It is insisted, on behalf of defendant in error, that the deceased did not know, until he received the shock, that the wire which produced his death was dangerous. On the other hand, there is proof tending to show that, about thirty days prior to the accident, the deceased was engaged, with others, in running a wire of the telephone company along by said pole where deceased was killed, and he received a shock at that time from one of the wires attached to that pole. It is also in evidence that, on the day of the accident, deceased stated that the wires were hot, and

he was warned, by one or two others, not to ascend the pole. This is a substantial statement of the case, as made in the pleadings and proof.

The thirteenth assignment of error is based upon the misconduct of the jury, in communicating to each other matters which were not presented in evidence. On the motion for a new trial, it was shown that, after the jury retired and were engaged in their deliberations, a juror stated to his fellow-jurors that the telephone company had, as a compromise of the case, offered to give Mrs. Simmons employment for twenty years at $45 per month. It was also stated in the jury room that, on the former mistrial of the case, ten of the jurors favored awarding the plaintiff $8,000 damages; one, $1,500, and another was against any amount. It is insisted, however, that these statements were innocuous and did not influence the jury in assessing the damages on this trial. On the motion for a new trial in the Court below, the jurors were examined touching this subject, and the substance of their evidence was that, when the jury retired to consider their verdict, a ballot was immediately taken, and all voted in favor of allowing the plaintiff damages against both defendants. The entire jury, excepting one man, favored damages exceeding $2,500, the final verdict. The one juror favored a verdict for only $500. The jurors testified that these extraneous statements did not, in any manner, influence their verdict, but the fact remains that, while one

23 P—26

of these jurors only favored $500 on the first ballot, he finally agreed to a verdict of $2,500. This juror stated that the extraneous statement as to how the former jury stood, on the mistrial of the case, was made for his benefit and in order to induce him to raise his figures, but he claimed that, as a matter of fact, it had no influence whatever on his action.

It has always been held in this State that testimony given to a jury after it has left the presence of the Court vitiates a verdict, because it is not on oath and is given without the knowledge of those to be affected by it, and who have, therefore, no opportunity of meeting and repelling it, and that testimony was so given may be shown by the affidavits of the jurors. *Donston* v. *State*, 6 Hum., 275; *Wade* v. *Ordway*, 1 Bax., 240 (S. C., 1 Leg. Rep., 159); 1 Shannon's Cases, 265; *Morton* v. *State*, 1 Lea, 498; *Nolan* v. *State*, 2 Head, 521. In the case of *Sam* v. *State*, 1 Swan, 61, the juryman stated that the information communicated to him by his fellow-jurors exercised no influence whatever upon him in making up the verdict, and that he thought or believed they would have come to the same conclusion from the testimony in the case. Judge McKinney, however, said it was not for this Court to say whether the testimony was sufficient to have supported the verdict, independent of the statement made to the jury.

In answer to the idea that the Judge might say

that there was sufficient evidence adduced at the trial to justify the finding of the jury, and that the evidence improperly given to them could have had no influence upon the verdict, that this was purely a matter of fact and not in the province of the Court to determine. It is impossible he should be able to do so, because the law had no criterion by which to know or ascertain the effect which the admission of improper evidence may produce on the verdict of the jury. The effect might be different, and of necessity would be so on different minds, according to the mental and moral qualities of the individuals composing the jury — their intelligence, power of discrimination, and a thousand other considerations — and, therefore, the law excludes all irrelevant and illegal evidence. He goes on, then, to remark upon the statement of the juror that he was not influenced, treating this as not of any weight, and concluded with the rule that, when improper evidence is allowed to go to the jury, it is enough that the case may have been prejudiced thereby, and the law will so presume. The Court said the rule in criminal and civil cases is the same. *Ordway* v. *Wade*, 1 Baxter, 340.

The third assignment of error is that the Court instructed the jury that, "If Simmons (the deceased) had no knowledge, either actual or by information, that the span wires of the street railroad company, at the point in controversy and strung to this pole, were not properly insulated and reasonably safe, then

he had a right to presume they were properly and safely insulated, unless the want of insulation at all, or defective insulation, was so open and obvious that he ought, in the exercise of ordinary and reasonable care and caution, to have so known.''

This charge we think erroneous, for it relieves the employe of the duty to exercise active diligence for his own safety in an occupation peculiarly hazardous, and where the employe has the better opportunity of discovering and avoiding the danger. In the case of the *Cumberland Telephone Co.* v. *Loomis*, 3 Pickle, 504, it was held by this Court, viz: ''A charge to the effect that a servant may assume that a telephone pole, which he is required to climb in the due course of his employment, is safe and suitable for that purpose, is erroneous in a suit brought by the servant for injuries caused by the breaking of the pole, in that it relieves him from the exercise of ordinary care for his own safety and decides that he was not the company's inspector of poles—a disputed fact in the case.'' In the case at bar the proof shows that it was the duty of Simmons, as a lineman, to dig holes, raise poles, put cross-arms thereon and steps, string wires, put on guy wires, and clear line troubles. And, as an inspector, his duties were the foregoing, together with clearing trouble in instruments, putting in new telephones, collecting, when needed, and making himself generally useful. The record further shows that Simmons was an experienced man in his line of

business; that he had been manager of the telephone company at Humboldt, and employed in the service at Nashville, where intricate systems of telephone and electric car wires cross each other and are maintained. It was necessarily a part of his duty to inspect and test the wires about which he expected to work.

The case of *Anderson* v. *Inland Telephone & Telegraph Co.*, 41 L. R. A., 410, was a case where a. servant of the telephone company brought an action against the telephone company and the street railway company, jointly, for personal injuries. At the time of the accident the plaintiff was a lineman in the employ of the telephone company. The two defendants used in common a pole—the telephone company for holding up its wires, and the street railroad company fastening to said pole a span wire or guy wire running from the trolley wire. The plaintiff, a lineman, ascended said pole for the purpose of stringing a wire on it, and, while on the pole, came in contact with the span wire belonging to the street railway company, and sustained from the shock serious personal injuries. It was held that the failure of the lineman to test the insulators would preclude any recovery.

*Bergen* v. *Southern Telephone Co.*, 70 Conn., 54 (S. C., 39 L. R. A., 192), was a case where a telephone company and an electric railroad company used the same pole for their wires, and the Court held that the law did not absolutely require the

telephone company, as between it and its linemen, to test and inspect guy wires and circuit breakers, put in by such railroad company, to discover whether they were in a safe condition, but whether the employer or employe should discharge such duty, depended on the facts of the particular case. "Linemen," said the Court, "are employed by the telephone company, among other things, for the purpose of doing work which is dangerous, by reason of the possible contact of the telephone wires with highly charged wires of the street railway or other companies. The linemen are to do their own testing on such work; the telephone company has no other men to do the testing than the linemen, as the latter knew. There was nothing to prevent Delaney (who was the plaintiff in the case) from testing the guy wire, and the linemen on this job were furnished with all the tools, appliances, and wires with which to test wires of the electric street railway."

The case of *Hector* v. *Boston Electric Light Co.*, 25 L. R. A., 554, shows the plaintiff was a lineman of the telephone company, and went upon the roof of the building, called the "Youth's Companion Building, for the purpose of affixing a telephone wire to a standard erected upon the roof of that building. He was injured while on the roof by his hand coming in contact with a wire belonging to the defendant (the electric light company), through which an alternating electric light current was being

transmitted. . . . The plaintiff had a long experience with electrical apparatus, was familiar with all kinds of electrical wires, and the proper methods of handling them, and the dangers attendant upon the business. It was admitted that the defendant was transmitting through these alternating wires an electric current of a thousand volts, which was dangerous under certain conditions. But it was contended that to make such a current dangerous, the person touching a wire must be 'grounded,' as it is called—that is, be connected with the earth by substances that are conductors of electricity, while the other wire of the circuit must be grounded at the same time." The claim of the plaintiff was, in effect, that the alternating electric light wires were not properly insulated. The Court held that the electric light company, on the evidence, owed no duty to the plaintiff to have its wires properly insulated at the place where he received his injury.

The sixth assignment of error, in which objection is made to the charge of the Court, on the theory of a sudden exigency or emergency of the business, is also sustained. This is not the case of an employe ordered by the master, upon a sudden emergency, into a place of danger. There is no evidence that deceased was ordered to ascend this pole and raise the sagging lead cable, but this method of accomplishing the work was chosen by deceased himself, rather than ascend a pole belonging to the telephone company, which stood thirty feet north,

and which deceased could have ascended and thereby avoided any contact with the wires of the street car company.

The trial Court was also in error in refusing the fourth and fifth instructions submitted by defendants, and embodied in the tenth and eleventh assignments of error on the brief of the telephone company. These supplemental requests embodied the theory of the defendant companies, and should have been given in charge.

For the errors indicated, the judgment is reversed and the cause remanded.