## VIRGIL LEE *v.* STATE.

### *(Nashville.* December Term, 1908.)

1. **CRIMINAL LAW.** Evidence held to be insufficient to estab-
   lish suicide.

   In a prosecution for murder, the evidence is stated and held to
   be insufficient to show that the deceased committed suicide.
   (*Post, pp.* 525-530.)

2. **SAME.** Evidence held to be sufficient to sustain a conviction
   of murder in the first degree.

   In a prosecution for homicide, the evidence is stated and held to
   be sufficient to sustain a conviction of murder in the first de-
   gree. (*Post, pp.* 522-549, 555.)

3. **SAME.** Self-serving declarations of the accused are incom-
   petent.

   In a prosecution for murder, the statements made by the accused
   to a witness as to the route he took on the day of the killing,
   which were in the nature of self-serving declarations, and made
   subsequent to the accusation, are clearly incompetent. (*Post,
   pp.* 549, 550.)

4. **SAME.** Affidavits of jurors indicating that verdict was
   reached by wrong reasoning are inadmissible to impeach their
   verdict, when.

   After a verdict of murder in the first degree, the affidavits of
   jurors stating the method by which they reached their conclu-
   sion and verdict, namely, that they considered that, as a rule,
   clocks in the country were too fast, and that the clock by which
   the accused and one of his witnesses testified as to the time when
   the accused left the house of the deceased on the day of the
   killing and how long before the deceased left the house was,
   therefore, too fast, were inadmissible to impeach the verdict,
   as indicating that it was reached by erroneous reasoning, where
   it is sustained by the evidence and is in accordance with the
   law. (*Post, pp.* 550-555.)

Lee v. State.

Cases cited and approved: Hudson v. State, 9 Yerg., 408, 411, 412; Norris v. State, 3 Humph., 333, 338; Saunders v. Fuller, 4 Humph., 516, 518, 519; Lewis v. Moses, 6 Cold., 193, 197, 198; Fish v. Cantrell, 2 Heisk., 578, 579; Wade v. Ordway, 1 Bax., 229, 235; Dunnaway v. State, 3 Bax., 206; Richardson v. McLemore, 5 Bax., 586; Roller v. Bachman, 5 Lea, 153, 160; Scruggs v. State, 90 Tenn., 51, 83, 89; Hannum v. State, 90 Tenn., 647, 651.

### FROM WAYNE.

Appeal in error from the Circuit Court of Wayne County.—SAMUEL HOLDING, Judge.

R. A. HAGGARD, for Lee.

ATTORNEY-GENERAL CATES, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the circuit court of Wayne county for the murder of one William Dixon, was convicted of murder in the first degree, and sentenced to be hanged. From this judgment he has appealed, and asks a reversal.

The facts are as follows:

In the late afternoon of Wednesday, the 25th of September, 1907, William Dixon disappeared from his home, on "Double Branches," in Wayne county, carrying with him a single-barrel, breech-loading shotgun.

Lee v. State.

On the following Saturday, about 12 o'clock, his body was found in the woods, about three-quarters of a mile from his home, with a large orifice in the back of the head. The muzzle of the gun was lying at the edge of the wound, or on the wound, with about two inches or two and one-half inches of the end of the barrel blown off. This gun was lying, not at right angles with the body, but somewhat inclined. It was lying, so to speak, on its back; that is, with the trigger up. In the gun was an empty cartridge. The body was lying prone upon the ground, face downwards. The thumb of the left hand was under one of the suspenders. The hand itself was resting at the lower part of the breast bone about on the stomach. The right hand was also under the body, but not so far under as the left hand. The left foot was very close to a log; just enough space between this foot and the log for a man to pass his hand. The right foot was a little further from the log. The body of Dixon was clad in a working suit known as "bib overalls." The log was about ten or twelve inches in diameter. The body was lying on a little high point, and was inclining up higher as it lay. About thirty steps from the place where the body was lying there was a logging road. On this road it appeared that a log wagon, drawn by two mules, had stopped nearly opposite the place where the body was found, being a little to the west of it. From this point there were indications in the weeds and grass of two persons having gone through the weeds and grass until a point about

fifteen feet from the place where the body was lying had been reached. From this point on there was only indication of one passageway through the grass and weeds. There were no tracks—simply indications of the kind just mentioned that two persons had traversed the space intervening the wagon and the place where the body was found in the manner indicated. Those who found the body stayed with it until Sunday morning, when the coroner's jury was impaneled, and there was present a member of of the medical profession, Dr. Taylor. He trust his hand into the wound and drew out some shot along with the brain. He testified that the course of the charge was towards the forehead, and that the front of the head was badly crushed; that is, the forehead, as we understand his statement. There is no evidence, however, that the shot went through the forehead; simply that that part of the head was shattered. The doctor testified that the course of the charge was from the lower part of the back of the head, slightly to the right of the middle line, forward and upward in the direction of the forehead.

There were indications that three oak logs had recently been loaded from a place near where the body was found.

The logging road ran back in a southeastern direction to the creek that ran along at the foot of the hill. By this creek ran the public road, on which was the home of William Dixon and his family, about a half a mile to the east of that point; that is to say, the

logging road left the public road at the foot of the hill, and ran up by the place where the body was found, and then further on up to the northwest.

From a point near where the body was found there was a track of a log wagon drawn by two mules curving around the head of a hollow in a southwestern direction over a difficult path down to the public road, at a point some distance above where the logging road above mentioned left the public road. A considerable distance to the west of the point last mentioned there were indications that this same log wagon had gone to the left of the public road as one goes west, and that four logs had been hauled from that point. From the point where the logging road left the public road one going east along the public road would reach the home of William Dixon on the side of the road about a half a mile away. About a mile still further east was the mill of Asa Prince.

The geographical points above mentioned will appear more clearly from the plat which appears on page 16 of the record.

The plaintiff in error ran a log wagon with two mules, and he boarded at the house of William Dixon, and was arrested and charged with the crime.

Before reciting the evidence introduced to show that the plaintiff in error was the guilty agent, we shall dispose of the contention made in his behalf that Dixon committed suicide. There is evidence to the effect that about two years before this occurrence, Dixon

suspected that his wife maintained improper relations with one Jim Harding, and he was heard to say about that time "that some day he would go off and people wouldn't know what became of him." Harvey Guinn, a brother-in-law of the plaintiff in error, testified that he heard Dixon refer to this matter "some time before he was killed," and that he wanted to sell his place. Another witness, W. Bedford, testifies that about a week before the homicide he heard Dixon say that some time he would step off from his home and they would never know what became of him; again, that he heard Dixon say that he had a notion of picking up his hat and going off.

The evidence of these witnesses does indicate that Dixon had entertained an idea of deserting his family. They do not, however, show that he contemplated suicide. Moreover, we think it extremely improbable that a man contemplating suicide would have shot himself in the back of the head with a shotgun, and still more so that the charge would have taken the course Dr. Taylor testifies that it did take. Dr. Taylor testifies that it was within the bounds of possibility, but so extremely improbable, that he does not see how it could have been accomplished. It does seem preposterous to suppose that a man would go off into the woods and shoot himself in that peculiar manner with such a weapon. Besides, we think the position of the hands, lying under the body, one of the thumbs under the suspender, shows that it could not have been a case of sui-

cide. It is true that the doctor testifies that "a deadly shot in the brain would cause the muscles to instantly contract, and might have caused the hands to be thrown to the front about his breast." We must receive this statement, of course, as a physiological fact from the expert; but we do not think it is at all probable that the hands would have been put in the position in which they were found, under the bib of the deceased, and the thumb under the suspender. No witness states in direct terms that his hands were under the bib; but we infer that such was the fact from the following statements of the witnesses: The witness T. R. Smith testifies that deceased "was in his shirt sleeves, and had on bib overalls; that he knew deceased well, and had noticed him in walking about; that it was his habit to have his hands under the bib of his overalls, or his thumbs under his suspenders." This witness states that, when the coroner got there on Sunday morning, "the body was turned over on its back, and that the left hand was about at the center of the body at the lower part of the breast, or about the stomach, and the right hand was not so far under him, but nearer the right side." The next witness, Dr. Taylor, testified that, "when the body was turned over, the thumb of his left hand was under his left suspender, and that the right hand was more to the right side, and not as far under the body, while it was lying onto him, as the left hand was." The next witness, Henry Smith, testified: "Saw body when turned over, and the thumb of

the right hand was under the right suspender, and left hand about middle of body on breast." It is perceived that these witnesses differ as to which hand was under the suspender; but it is clear that either the right or left hand was under the suspender, and, if so, was under the bib. It is hardly conceivable that any convulsive contraction of the muscles caused by the impact of the shot would have placed the hands of the deceased, or either of his hands, under his bib, with the thumb under the suspender. The gun with which Dixon was killed has been sent up for the inspection of the court, and prisoner's counsel demonstrated before the court how the gun might have been so placed by the deceased at the back of his head as to have taken the range indicated by Dr. Taylor. We have ourselves repeated the experiment, and think that the gun might have been placed in such a position by the deceased as to have delivered the charge in the direction indicated by Dr. Taylor; but this could not have been done without having the muzzle in close contact with the head, certainly not more than an inch away from it. With the muzzle of the gun so close to the head as this, every one knows that the hair would have been singed, even if the flesh around the wound had not been cooked. There is nothing in the evidence upon this subject, with respect to the hair or the surrounding tissue or flesh. It is possible, we may surmise, that the orifice was so large as to have covered the whole area of the discharge of flame, as well as of shot, and that might account

for the absence of singed hair elsewhere, or cooked flesh elsewhere. So, we place the practical impossibility of suicide on the position of the hands above indicated, to say nothing of the presumption against suicide. We may add the fact that two and one-half inches blew off from the end of the gun barrel when it was discharged necessarily indicates such violent action on the part of the weapon as would make it extremely difficult, if not impossible, to conclude that it fell in the exact position in which it was found, with the muzzle of the broken barrel resting on the wound in the back of the head of deceased. This position of the gun indicates that it did not fall there accidentally, but was placed there by the action of some one after the death of the deceased. There are some other circumstances upon this same subject which we have not previously mentioned, but which we should state before leaving it. If the plaintiff in error is to be believed, and if Mrs. Hortense Dixon, the widow of the deceased, is to be believed, he was preparing to make an addition to his house, and had just hauled to his premises about twelve hundred feet of lumber for this purpose, and was engaged in assorting this lumber, and was transporting with his own hands a part of it to the place where the new room was to be built, and this on the very afternoon that he left with his gun, and a few minutes before he did leave. According to the widow's testimony, he left because he heard the bark of a squirrel in the woods.

121 Tenn—34

We do not think, from any point of view, there is anything in the theory of suicide. We think it clear that some one killed William Dixon.

The next question to be determined is whether the plaintiff in error killed him.

In July, immediately preceding the month of September in which Dixon met his death, plaintiff in error was deserted by his wife on the ground that he had been guilty of improper conduct with other women. He went to board at the home of Dixon. He admits in his examination that within a week after he began to board there he established immoral relations with Mrs. Dixon, and that these relations continued up to the death of Dixon and afterwards. He told several people in the neighborhood the most astonishing and disgusting stories of the bestial conduct of Dixon, and said that he ought to be killed. He said that if people wanted to get rid of him, just to watch him for awhile, and they would see things that would enable them to get rid of him. We shall not go into the details of these horrible stories. It is enough to say that nothing worse could be said of any man than was said of this man by the plaintiff in error. No crime more shocking and loathsome could be conceived. The plaintiff in error is proven to have said, on another occasion, that Dixon was "jealous-hearted" of Jim Harding, and that if he ever got so with him he would kill the G—— d—— s—— of a b——. Mrs. Dixon testified that he had told her that her husband did not treat

her right. It must be stated, however, along in this connection, that to all appearances plaintiff in error and Dixon lived together harmoniously, each helping the other along with his work, and Mrs. Dixon says she never heard a cross word between them. But the real feeling entertained by plaintiff in error towards Dixon is shown by the tales he told about him, and the expressions he used to the effect that he ought to be killed, and that he ought to be run out of the country. When the people were hunting for the body of Dixon, plaintiff in error suggested that some of the mill people might have killed him; also the names of two persons concerning whose wives plaintiff in error said that Dixon had made damaging remarks, and he suggested that one of these people might have killed him. He also suggested that he might have gone off and left his family. Dixon disappeared, as stated, on Wednesday, on the afternoon of that day. Plaintiff in error, the same afternoon, left the home of Dixon with his log wagon to go to the home of his father, Edward Lee, to haul some rails, as he stated, to build a pen for his hogs. He came back, however, the next day to the home of Dixon, saying that he found when he reached his father's home that the corn he had for his hogs had given out, and he had to come back to the neighborhood to get a road wagon that one Tom Austin had borrowed belonging to him. This was Thursday morning. As he came along the road he was informed by some of the neighbors that Dixon had disappeared, and the neigh-.

bors were searching for him. He went on to the house
of Dixon, and put up his animals and joined in the
search. He came back to Dixon's house about half past
1 o'clock and ate a cold lunch. Mrs. Dixon said that
she wished that some one would go to the house of her
father over on Green creek, about seven miles away,
and see if her husband was there. Plaintiff in error
said he would go. Thereupon he rode one of his mules
over to the house of Mrs. Dixon's father, and in the
afternoon came back with the old man, and the two
stayed that night at the house of Mrs. Dixon. After the
old man had gone to bed, plaintiff in error admits, and
Mrs. Dixon testifies, that plaintiff in error told her,
in effect, not to worry if her husband had gone off and
left her; that she would be taken care of. He says that
he meant that her father would take care of her. We
think the more probable view is that he referred to him-
self, when we take into consideration the relations ex-
isting between the pair. The next morning, Friday,
Dave Odel testifies that he went over to Dixon's house,
and while there saw the plaintiff in error and had a
conversation with him at the yard fence of the de-
ceased's home, and in that conversation he said to the
plaintiff in error, referring to the deceased, "If that
man is anywhere around there in those woods, I can
find him before 12 o'clock," and that defendant then
said to him: "He is right up yonder on a point. I
killed the G—— d—— s—— of a b——; and,
G—— d—— you, you stay in the roads and hollows,

and if you ever tell it I'll kill you, and if they get me where I can't kill you, I've got a friend that will kill you." This statement should be taken in connection with the testimony of Tom Austin, who says that while plaintiff in error was getting his mule ready to go over to the home of Mr. Morgan, the father of Mrs. Dixon, as above stated, the plaintiff in error stated to him, the witness, that "somebody might have killed him (deceased), and that they might find him over there," pointing over in the direction of where the body was found. Now, to return to the testimony of the witness Dave Odel. The witness says that, after being threatened in the manner just stated by the plaintiff in error, he did not hunt for the body, but stayed in the road and hollows, as plaintiff in error had warned him: that the witness went home in the afternoon of that day, and did not go back over there. He further testified:

"Defendant was put in jail, and stayed in jail for some time, and then made bond; and after he came back, witness went from his home over to Edward Lee's to get a piece of beef. Mr. Lee was going to kill a beef, as he was informed, and that he did not want to go over there after the piece of beef at all; but his daughter kept insisting on his going, and he went, and when he got over there they were killing a beef, and the defendant was there, and after witness had got his piece of beef and started away, and got out to his horse, the defendant called him off to one side and said to witness,

'Have you told anything yet?' and the witness answered
that he had not, and then the defendant said to witness:
'All right, you had better not. If you do, I'll do just
what I said; and if I don't, my friend will.' Witness
said he did not tell anybody about what defendant had
told him until just before the April term of the circuit
court—last April [referring to April, 1908]—and the
first person he told was his daughter, Mrs. George
Risner, who lived with him. Witness states that he
was afraid of defendant, and feared that defendant
might think he had told it, and kill him. Witness
never told anybody about what defendant had told him
until just before the April term of said court, 1908,
and then he told his daughter, Mrs. Risner, and wanted
to take out some kind of a peace proceeding against
the defendant. The reason he did not tell any one was
because he was afraid the defendant would kill him.
Defendant came to witness' house two or three times,
but witness avoided him. After the conversation with
defendant when he (witness) got the beef, he (witness)
became more uneasy, and finally told his daughter what
defendant had told him." On cross-examination he
said that "he had not told it while defendant was in
jail because he was afraid of defendant's friend; that
he didn't know who defendant's friend was, but, when
he did tell it, defendant was out on bond, and staying
right in the neighborhood of where the witness lived."
The witness was further asked on his cross-examination
if he did not tell Bud Brewer that the time when the

plaintiff in error made the statement to him about kill-
ing Dixon was on Thursday, instead of Friday. The
witness says he did not; but Brewer says that he under-
stood the witness to say the next day after the disap-
pearance of Dixon. He was asked if he did not make
the same statement to G. W. Brewer, and he says he
did not. These two witnesses were persons who were
on the bond of plaintiff in error, and arrested him, and
took him to the sheriff immediately upon receiving the
information above mentioned from Dave Odel. It will
be perceived the difference here is only as to the day
on which the confession was made by plaintiff in error
to Dave Odel. He was also asked whether he had stated
to G. W. Brewer at the same time that he told the
latter, concerning plaintiff in error's confession to him,
that if any of the lawyers accused him (the witness) of
swearing a lie he would bang a chair over their heads.
He said that he did not, while Brewer says that he did.
Dave Odel was asked if he did not have a conversation
with Kay Dickey at his (Odel's) gate on Sunday week
after Dixon was killed. Witness answered that he
did. He was then asked the following questions: "Did
not Dickey ask you if you thought they had the right
man that killed Billy Dixon, and did not you say, 'No,
I don't; I think Virgil Lee is as innocent of killing that
man as you and me are.' A. I told him that. I didn't
know but what he was sent there. Q. Did not Dickey
then say, 'Who do you think, then, done it?' and did
you not then say, 'I believe he done it himself.' A. No;

I never said it. Q. And did not Dickey then say to you, 'Mr. Morrison said he could not have killed himself,' and you said, 'They needn't talk such stuff as that to me.' A. Nothing of that kind was said. Q. And then did not Dickey say to you, 'What makes you think that Billy killed himself?' and replied, 'From the talk that Billy has had for the last three or four years, when he was here, about me.' A. No, sir; I never said no such thing." Kay Dickey was introduced by plaintiff in error, and testified that Mr. Odel did say the things stated, or in substance that. On re-examination Dave Odel was asked: "Why did you tell Kay Dickey that you didn't believe that Virgil Lee killed Dixon?" Witness answered that he did not know but that Kay Dickey was sent to him by Virgil Lee to see what he would tell, and he was afraid, if he told it, that Lee would kill him. Dave Odel was asked if he did not tell Solon Lee, the uncle of plaintiff in error, that the confession was made in the hollow up above Dixon's house. The witness replied that he did not. Solon Lee, introduced by the plaintiff in error, testified that such a statement was made to him.

Dave Odel is corroborated to this extent: Charlie Odel, his son, eighteen years old, testified that he was with his father the day the latter went to the house of Edward Lee for the beef, and when they had gotten the beef, and his father was ready to go, plaintiff in error came out where the latter was, and called him off and talked to him; but he did not hear what was said. The

plaintiff in error himself admits that he and Odel did have a private conversation there; but he says that Odel called him aside and asked him what evidence was introduced against him at the committing trial. Plaintiff in error was introduced on rebuttal, and asked him about his having requested Bud Brewer to go and examine the wagon tracks on the Monday after the killing, the day after he had been arrested. He was asked if Bud Brewer did not suggest that they get a number of the oldest and best citizens in the neighborhood to go and examine the tracks, and if Dave Odel was not mentioned as one of this number by Bud Brewer, and if he (plaintiff in error) did not object to their getting Dave Odel to go: He said that he did not. The state then introduced Bud Brewer, and asked him if he did not suggest to plaintiff in error, when they were talking about whom they should get to go and look at the wagon tracks where plaintiff in error had been the day Dixon left home, that they get Dave Odel and a number of other of the old men and best citizens to go and examine them, and that plaintiff in error objected to Odel going. Witness answered that he did; that defendant said Odel was an old man and would not wish to go.

Will Kilburn was introduced by the State, and testified that he was at Dave Odel's the day Kay Dickey was there, and he heard Odel tell Dickey that he did not believe Lee killed Dixon; but that was all he heard Odel tell Dickey.

The State then introduced J. H. Merryman, L. P. Collier, D. S. Cayton, W. A. Kilburn, William Greacy, H. A. Helton, E. D. McGlamery, John Griggs, Ike Clay, and Jake Scott, all of whom testified that they knew the general reputation of Dave Odel, and that it was good, and that they would give him full faith and credit on his oath.

The plaintiff in error made the confession testified to by Dave Odel; also he said to various persons that Dixon ought to be killed or run out of the country. He testifies that he and Dixon were on good terms, and that the relations that he and Mrs. Dixon sustained to each other were with the consent of Mr. Dixon. He denies that he killed Dixon.

His account of the day is thus stated:

"He had been on 'Double Branches' for some time logging for Asa Prince, or for his mill. He was employed by Prince to haul oak logs to the mill out from the white oak tops left by the stave company. He had known deceased for a number of years before he went to his house to board, and also knew his wife. He and the deceased had always been good friends; never had a cross word or any disagreement of any kind. While witness boarded at deceased's house, they helped each other work—swapped work—and witness loaned deceased his wagon and team sometimes to haul with. On the morning of the 25th of September, 1907, witness went to the woods about the usual time to haul logs, and went to the Waynesboro and Westpoint road,

and turned off, and went up the old log or stave road which leads up on the ridge near the point where the body was found, and upon that ridge he loaded on his wagon that morning three oak logs and then carried them to the mill, going back from the woods the same way he went out, and on to the mill; and after unloading these logs he went back up the road—the main road, by deceased's house, and on the same way he had gone before, up the old log or stave road, to the point where he got the three oak logs, a short distance above and west of where the body was found.  There he stopped his team, and left them there, and walked out further, about one hundred yards, or maybe two hundred yards, on this old road, to see if he could find some more logs out there, but failed to find any and returned to his team, and, knowing there were some logs on the other side of the creek, he turned his team, and went around the head of a steep hollow, and down the point to the creek, turning down the creek a short distance for a good place to cross the creek, and into the main road, and up the road a short distance, turned to the left, and crossed the creek or branch, and over to the road, and loaded four logs, and turned around and went back into the road near where he turned out, and drove on to the house of deceased, stopped, took out his mules, fed them, and went in and ate his dinner.  It was a little after 12 o'clock.  After dinner he hitched up his team and took the logs on to the mill, and de-

ceased went with him to the mill with these logs. After unloading these logs, deceased got a joist or piece of lumber of some kind to carry to his house to use somewhere about his stairway. Witness drove his wagon over across to the back of Asa Prince's field which is east of the mill, where Prince had told him he had some green logs cut; but he failed to find the logs over there, and drove back to the mill and on up to deceased's house. Then he and deceased went up on the hill, situated a short distance above the house, and loaded on the wagon a poplar log, which deceased had cut off of his own land, and witness hauled it to the mill for him. Deceased, his wife, and children all went down to the mill along as he went with the wagon. This log was carried to the mill, unloaded, and then he and deceased loaded a lot of lumber, about one thousand or one thousand two hundred feet, which belonged to deceased, and hauled up to his house and unloaded it; and witness then went in the house, changed his shirt, and then told Mrs. Dixon that he was going out to his father's that evening, to haul some rails to fix his hog pen (witness had about one hundred head of hogs out at his father's at that time), and remarked that it was then five minutes after 5 o'clock, and that it was time he was gone, and left the house, got on his wagon, and drove off, leaving deceased there separating a lot of lumber, putting each lot as to width and thickness to itself. When witness got to the first ford of the creek above the house he stopped to let his mules drink. He

Lee v. State.

holloed back to deceased that he need not cover his lumber at the mill, as he (witness) would be back the day after to-morrow (Friday) and would haul it for him. Deceased had told him he was going back to the mill and cover the lumber he had there. Witness then drove on, and never stopped his team another time until he got to his father's except right at the head of the creek, when he stopped and got him a drink of water. Witness got to his father's before sundown and a little before dark, and left his wagon out in the road, carried his mules to the barn, and fed them. . . . Witness stayed at his father's that night, and found out that he was out of corn, and the next morning he started after his road wagon in which to haul some corn for his hogs. He had loaned his road wagon to Tom Austin, who lived down on Double Branches below the house of deceased; and he drove his log wagon back down the same road that he traveled the evening before, and some distance above the house of deceased he heard some one holloa, and he stopped, and Lee Wisdom came out to the road, and told him about deceased leaving the house with the gun and that they were looking for deceased."

The circumstances of Dixon leaving the house with the gun is related by Mrs. Dixon, and we now turn to her evidence and start at the point referred to in plaintiff in error's evidence where the lumber was unloading after coming back from the mill on the afternoon of Wednesday, September 25th, the day her husband dis-

appeared. Her testimony, beginning at this point, is as follows:

"After the lumber was unloaded the defendant came into the house and got him a drink of water, and then stated to her that he was going to his father's that. evening to haul some rails to fix up his hog pen, and that defendant then looked at the clock and remarked that it was 5 o'clock and that he must go, and left the house, went out to his wagon, and drove off up the road in the direction.of where his father, Edward Lee, lived, who lived at that time at the old Judge Morris place, which she reckoned was about five or five and one-half miles from her home. After the. defendant left her house her husband separated the lot of lumber he and the defendant had hauled, putting each kind of lumber to itself, and then carried from outside of the yard, near the road, to the house, some sleepers, nine or ten, and laid them down on the sills he had placed for the new room. He then went out and crossed the yard from the house to a sugar cane patch, and cut some cane to feed their mare on, and cut the cane, took it to the lot, and gave it to the mare, and came back and cut some stove wood, and while he was cutting the stove wood she went out where he was after some of the stove wood, and while out there her husband remarked that he heard a squirrel barking up there in the woods, and he was going to get his gun and go and kill it, and went in the house, got the gun, and called his dog, and went off into the woods, and she thought he went up the road, but she could not say

for certain, as she paid no attention to him after he left the yard. She carried her stove wood into the house, sat down, and in about fifteen or twenty minutes she thought she heard a gun fire which sounded, as she thought, 'kind o' dead.' She prepared supper. She waited for him until nearly dark, and began to get uneasy about him, and went up the road nearly to where the road crosses the creek the first time above the house, and could hear nothing, but said the dog came down the road, and he would stop and look back in the direction from which he came. She went back to the house and waited until about 9 o'clock. Then she got the horse and rode down to Mr. William Gallaher's, a neighbor that lived about half a mile below, and told him that her husband had gone off with his gun late that evening, and had not come back, and Mr. Gallaher told her that he guessed he had gone to some neighbor's house and concluded not to come home that night. She then went back home and stayed there with her children that night. . . . The next morning Mr. Gallaher and several other men, neighbors, came up there, and she showed which way she thought her husband went, and they started out to hunt for him; and awhile afterwards the defendant came in with his wagon and team, and said he had come back to get his road wagon to haul some corn for his hogs; that Mr. Austin had his road wagon, had borrowed it, but defendant did not then go to Mr. Tom Austin's for his road wagon, but put his mules into the stable and went with some of the men to help hunt for her husband."

Mrs. Dixon says that she stated as a witness before the corner, and also at the committing trial before the magistrate, the time of day the plaintiff in error left her house, and what he had told her about her husband not treating her right, and about her immoral relations with the plaintiff in error. She further said that after the committing trial of the plaintiff in error, and after he had made bond, he came to her house twice— in the nighttime both times; that the first time he came she heard him around her house, "then he came to the door, and knocked and knocked, and she knew who it was, and she said to defendant, 'Are you my friend?' and he said that he was, and she then let him come in, and while there defendant tried to get her to change her statement and make it different to what she had at the preliminary trial, and told her if she would change her statement it would stop the whole thing, or if she would go out to Waynesboro, and state it differently to his lawyer, that it would make it all right, and she told the defendant that she would not change anything she had said about it; that she had told the truth about it." She says that plaintiff in error wanted her to change the statement she had made about the time of day he had left her house, and as to what he had told her about her husband not treating her well, and about her immoral relations with the plaintiff in error.

On cross-examination she said that at the time the defendant left her home on the afternoon deceased went off with the gun, when defendant looked at the clock

and remarked as to the time of day, that it was five or
seven minutes after 5 o'clock. The defendant had been
gone for something like half an hour when the deceased
left with the gun.

The plaintiff in error's testimony upon the subject
of the effort to get her to change her evidence is as
follows:

"After he had made his bond and got out of jail, he
went back to Mrs. Dixon's house twice at night. The
first time he went there and spoke to her about chang-
ing her statement about the case, he merely wanted to
see if she would change it, or if she could be persuaded
to change it; that he did not really want her to change
her statement, but wanted to see if she was going to
be persuaded to do so. The witness stated that she
told him that she was not going to change her state-
ment in the case at all." He said that the second time
he went to her house at night was not upon the sub-
ject of the statement, but to renew his immoral rela-
tions with her.

The impression made by Mrs. Dixon's version of this
matter is that the statements which she had made be-
fore the coroner and on the committing trial were con-
sidered injurious to the plaintiff in error's defense, and
that he wished to induce her to take them back or deny
their truthfulness. On the contrary, the impression
made by the testimony of the plaintiff in error upon
the same subject as above set out is that he was en-

121 Tenn—35

tirely content with her statement and did not wish her
to change it, but feared that she might be persuaded
to do so.

When we consider the immoral relations existing be-
tween Mrs. Dixon and the plaintiff in error, and the
faithless life she was leading by reason thereof toward
her husband, we find it difficult to place any confidence
in her testimony in any respect wherein it benefits the
plaintiff in error. There was matter hurtful to the
plaintiff in error's defense in her statement as to the
immoral relations that had existed between the plain-
tiff in error and herself; also in the fact that he had told
her that her husband was not treating her right; but
that part of her evidence in which she fixed the hour
and minute at which the plaintiff in error left her home
and started to his father's house, and the time at which
her husband left with the gun, and the various things
he did between these two periods, was exceedingly fav-
orable to the plaintiff in error. She fixed the time at
which plaintiff in error left as at five minutes after
5, and said that her husband did various things there-
after, carried pieces of lumber to the place where the
new room was to be built and cut the sugar cane, and
fed his mare, and cut stove wood all of which things,
she says, consumed a half an hour. The plaintiff in
error also says that deceased was sorting out the lum-
ber when he left. Mrs. Dixon gives plaintiff in error a
half an hour's start of her husband; that is, says that
plaintiff in error had left a half an hour before her hus-
band started to the woods. It is very evident why

plaintiff in error did not wish Mrs. Dixon to change her statement. With half an hour's start the plaintiff in error would have gone far beyond the place where the logging road turned off from the main road. The weight of the evidence shows that plaintiff in error reached his father's house just about dark. It was five and one-half miles to his father's house, and the testimoney shows that a man driving a log wagon would go three or three and one-half miles an hour. However, it is in evidence that plaintiff in error said to one of the witnesses that he went rapidly.

Now, to recur to the agreement in the evidence of plaintiff in error and Mrs. Dixon as to the time the former left the Dixon home to go to his father's house. In view of the immoral relations sustained between the plaintiff in error and Mrs. Dixon, both before the death of Dixon and afterwards, and the visit by night which the plaintiff in error paid to Mrs. Dixon, to make sure that she could not be persuaded to change her statement, and the peculiar circumstance that he called her attention to the clock, according to his evidence and hers, by saying, "It is now five minutes after 5, and I must be going," and the particularity with which he relates it, and the particularity with which she relates it—we say, in view of all these things, we find it very difficult to believe the testimony of Mrs. Dixon and of the plaintiff in error upon this subject. Nobody else in the record testifies as to the time that either plaintiff in error or Dixon, or both of them, left the Dixon home.

There is another peculiar thing in this case. It will be remembered that there was evidence that the log wagon, with a team of mules attached to it, stopped nearly opposite the place where the body was found. The plaintiff in error accounts for this by saying that after he had made the first trip up to that place in the morning, and had gotten the three oak logs, and had conveyed them by the same route down the hill to the main road, and along the main road eastward to the mill, he returned up the same logging road, and stopped the team at the place indicated, and then walked along that road one hundred yards, or maybe two hundred yards, to see if he could find some other logs, and, not finding any, instead of going down the logging road as before, he cut across the head of the hollow and went through the woods quite a way, over logs, etc., down to the main road, and then out to the other side of the road to get four logs over on that side. It is singular that he should stop the mules at the particular place where they were stopped, and that he should walk one hundred or two hundred yards up the road for logs which he says he did not find. It is in proof that the drivers of log wagons go over very rough places, and frequently go through the woods over rough places where there is no road, just so they can get through the woods; but it is singular that while he was on the regular road, down which he could go as previously, he should go around the head of the hollow, and go through the woods over a place where there was no road at all, to reach the main road in that manner.

Another singular fact is that two witnesses testify to peculiar conduct on the part of the plaintiff in error when he went to where the body was found. These witnesses say that he acted strangely. One of them says he did not look at the body, but looked over the body. Both say he was whittling part of the time in front of him and part behind his back. It is also singular that he did not wish Mr. Odel to be among the men who were to look at the wagon tracks.

It is not singular that Mrs. Dixon did not go out to the woods to see the body of her husband; but it is singular that she says she did not look at the body after it was brought to the house.

How far the faithless wife of the deceased was involved in this tragedy we need not venture an opinion. It is sufficient to say that, taking together all the circumstances we have related, and placing them along with the confession made to Dave Odel, we cannot say that the preponderance of the evidence is against the verdict of the jury. Indeed, we think the case is made out.

The next question to be considered is whether the trial judge erred in sustaining an objection made in the court below to certain evidence offered by the plaintiff in error.

The witness Bud Brewer stated that, the next week after plaintiff in error's arrest, he and others went to the place where the body was found, and tracked the log wagon around the head of a hollow, down the point,

to the creek, and into the road, and then some distance up the road; that they found where a log wagon (the tracks being apparently of the same age as those on the point) had turned from the road to the left, and had gone through a little swampy place and upon the hill side, had taken on four logs, as it appeared, and then turned and went back into the main road near where it turned out. He was then asked whether he had been informed by the plaintiff in error before he went there to investigate the logs, and while the plaintiff in error was in jail, concerning the route he had gone with his log wagon the day Dixon left his home, and he said he had. He was then asked: "Did the track followed by you and others from a point on the ridge near where the body was found, around the head of a hollow, down a point to the creek, and also where it turned out into the main road to the left, out through the little swampy place, up on the hillside, and back to the road, correspond with the route defendant detailed to you, as you have stated?" The attorney for the State objected to this evidence in the court below, and this exception was sustained by the trial judge, to which action of the court the defendant below, plaintiff in error, entered an exception.

We think the action of the trial judge was correct. The statements of the prisoner to Bud Brewer were in the nature of self-serving declarations, and made subsequent to the accusation against him, and after the controversy between him and the State had arisen. The evidence was clearly incompetent.

Lee v. State.

The next and last question is whether the circuit judge committed error in refusing to grant a new trial on an affidavit made by five of the jurors. These jurors, in support of the motion for a new trial, made affidavit as follows:

"That while considering of their verdict in the case, and in the consideration of the specific question of the alibi sought to be shown by the defendant, and the time when the defendant left the house of the deceased, it was suggested by some of these jurors that the clock at the home of the deceased, by which the State's witness Hortense Dixon and the defendant both testified the defendant left said house at from five to seven minutes past 5 o'clock, was too fast, and that it might have been really half past 4, and even earlier than that time; and this question of the clock being too fast was discussed by the jury, and it was suggested and considered by the jury that as a rule the clocks in the country are too fast, and considering this rule as to clocks generally in the country, and upon that rule and conclusion, they determined that this clock was too fast —that is, ahead of the sun time—and that the defendant therefore left the home of the deceased earlier than the time registered by the clock at said home, as testified to by said State witness Hortense Dixon and the defendant; and upon the time thus determined the jury decided that the defendant had left the home of the deceased in time to have gone to the place where the deceased was found, and awaited his coming, then killed

him, and reached the home of defendant's father, as testified to by defendant's father and sister and M. A. Rinks."

We have in this State three lines of cases upon the subject of admitting the affidavits of jurors to impeach the verdict. The first of these is covered by the cases of *Crawford* v. *State,* 2 Yerg., 60, 24 Am. Dec., 467; *Cochran* v. *State,* 7 Humph., 547; *Nelson* v. *State,* 10 Humph., 533, and *Galvin* v. *State,* 6 Cold., 283, 286, 288. These cases do not bear upon the phase of the matter presented in the present controversy, and need not be further noticed. The next line is composed of cases wherein the court held that the affidavit of jurors might be introduced for the purpose of showing that a member of the jury had communicated to his fellow jurors facts not submitted to them on the trial by the testimony of witnesses; in other words, cases wherein the jury had themselves testified to their fellows, after they had been impaneled. These cases are as follows: *Booby* v. *State,* 4 Yerg., 111; *Donston* v. *State,* 6 Humph., 275; *Sam* v. *State,* 1 Swan, 61; *Nolan* v. *State,* 2 Head, 521; *Wade* v. *Ordway,* 1 Baxt., 240; *Morton* v. *State,* 1 Lea, 498; *Whitmore* v. *Ball,* 9 Lea, 35; *Nile* v. *State,* 11 Lea, 694; *Ryan* v. *State,* 97 Tenn., 211-213, 36 S. W., 930; *Irvine* v. *State,* 104 Tenn., 132, 142, 143, 144, 56 S. W., 845; *Street Railroad & Telephone Companies* v. *Simmons,* 107 Tenn., 392, 401-403, 64 S. W., 705. And see *Iron Co.* v. *Pace,* 101 Tenn., 476, 484, 48 S. W., 232 and *Forsythe* v. *Central Manufacturing Co.,* 103 Tenn., 497,

53 S. W., 731. The third line of cases embraces those wherein it was sought to impeach verdicts by showing the erroneous reasons or grounds which actuated or controlled the jury in arriving at their verdict. These cases are as follows: *Hudson* v. *State*, 9 Yerg., 408, 411, 412; *Norris* v. *State*, 3 Humph., 333, 338, 39 Am. Dec., 175; *Saunders* v. *Fuller*, 4 Humph., 516, 518, 519; *Lewis* v. *Moses*, 6 Cold., 193, 197, 198; *Fish* v. *Cantrell*, 2 Heisk., 578, 579; *Wade* v. *Ordway*, 1 Baxt., 229 (Syl. 2), 235; *Dunnaway* v. *State*, 3 Baxt., 206; *Richardson* v. *McLemore*, 5 Baxt., 586; *Roller* v. *Bachman*, 5 Lea, 153, 160; *Scruggs* v. *State*, 90 Tenn., 51, 83, 89; *Hannum* v. *State*, 90 Tenn., 647, 651.

The substance of this last line of decisions is sufficiently stated in the following excerpt, which we make from *Lewis* v. *Moses*, supra. In that case the court say:

"In the case of *Harvey* v. *Jones*, 3 Humph., 159, it is said: 'This court has repeatedly had occasion to comment upon the danger of setting aside verdicts upon the affidavits of jurors, and to declare that it will be done only in extraordinary cases, and then with great caution.'

"And in *Norris* v. *State*, 3 Humph., 338, 39 Am. Dec., 175, the court say: 'No case has occurred where a new trial has been granted upon the ground that a juror has rendered his verdict upon a mistaken opinion of the law or the facts, or that the charge was misunderstood.' *Saunders* v. *Fuller*, 4 Humph., 516. In this latter case the court say they will not carry the matter further

than it has already been. There are other authorities equally as strong. In this case no exception was taken to the charge of the court. It is admitted that there is evidence to support the verdict—that is, that the jury might have arrived at the conclusion to which they did arrive, and been governed by the law and the testimony; but it is insisted that the facts disclosed in this affidavit show that the jury did not arrive at their verdict by a correct process of reasoning, that they resorted to facts not proper to be considered, and upon principles not applicable to the case, and that for this reason a new trial should be granted. If this rule were adopted, but few verdicts would be permitted to stand. Jurors may arrive at the same conclusion, and render the same verdict, but the influences that control their minds, and the process of reasoning by which they arrive at their conclusion, are as diverse as the human mind itself; and the argument and reasons governing each juror in rendering his verdict might not always be found the most logical, or in accordance with the views of the court. If no error of law was committed, if the jury were guilty of no misconduct, if the verdict they render is supported by the evidence, this court could not set it aside upon the affidavit of a juror that he reached this result by erroneous reasoning, or from considerations that should not have influenced him, but will presume that the result arrived at was the legitimate result of the law and the facts."

Lee v. State.

We think the affidavit in the present case falls within the last line of authorities, as the substance of these cases is expressed in the opinion just quoted from. The affidavit undertook to state merely the method by which the jury arrived at their conclusion, or the reason upon which they reached the result. The reason given, it is true, was an erroneous one, and involved a matter which they had no right to consider; but within the rule as above laid down, when the court can see that the verdict is sustained by the evidence which was submitted to the jury, and that it is in accordance with the law, we cannot reverse because the jury reached the true result on erroneous grounds and entertained considerations which they had no right to indulge.

As we have already pointed out, the verdict in the present case is fully sustained by the evidence, and is in accordance with the law.

The judgment must therefore be affirmed.