LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Plaintiff in Error, v. JOE DILLEHAY, Defendant in Error.

Middle Section, August 7, 1926.

Certiorari denied by Supreme Court, December 11, 1926.

1. **Evidence. A verdict cannot be based on conjecture.**
Where the evidence shows that an injury is as likely to have happened from one cause as another and the defendant is not responsible for one cause, then the verdict of the jury would be a mere guess and a verdict should be directed for the defendant.

2. **Evidence. Where there is evidence that there is only one cause for the injury there is a question for the jury.**
In an action to recover for injuries sustained by a fall where a part of the witnesses testified that the injuries could have been caused only by the fall and there were other witnesses testifying that it might have been caused either from the fall or from infected tonsils, held there was a question for the jury and it is for them to determine whether they believed the witness who stated that the injuries were caused from the fall alone.

3. **Evidence. Expert testimony. Court properly charged that expert testimony should be received with caution.**
Where the charge of the court instructed the jury that they were not bound by the opinions of doctors but that they might weigh and consider these opinions along with other testimony in the case and give them such weight and credit as the jury might think right and proper, held the instruction was good.

4. **Appeal and error. Recitals of fact in motion for new trial cannot be considered as evidence on appeal.**
Where error was urged to the remarks of the attorney in the trial below, but there was no evidence in the record of the remarks made, the only recital of it being in the motion for new trial held recitals of fact in the motion for new trial are not evidence, because, such motion is merely a pleading and is not evidence of what occurred in the trial and there was therefore nothing for the appellate court to review.

Appeal in Error from Circuit Court, Maury County; Hon. W. B. Turner, Judge.

Affirmed.

Hughes & Hughes, Charles P. Hatcher, of Columbia, John B. Keeble, of Nashville, for plaintiff in error.

J. B. Garner, of Columbia, for defendant in error.

DeWITT, J. This was an action brought by Joe Dillehay against the Railroad Company for damages for injuries alleged to have been sustained by him on the night of August 14, 1924, while under employment by the company as a switchman. The suit is predicated upon a violation of the Federal Safety Appliance Act (Sec.

2, 36 Sts. L. 298, Act April 14, 1910), requiring, among other things, that all railway cars used in interstate commerce shall be equipped with secure running boards; and upon the consequent liability of the railroad company under the Federal Employers' Liability Act (Secs. 1, 3 and 5, 35 Stat. L. 65, 66, Act of April 22, 1908). It is not claimed that the plaintiff below was guilty of contributory negligence, which, under the statute, would only go in mitigation of the damages; nor is it denied that these statutes have operated to convert the general legal duty of exercising ordinary care to provide safety appliances and keep them in repair, into an absolute and imperative duty of making them secure, and to enforce the duty by appropriate penalties and remedies. Chicago, etc., Railroad Co. v. U. S., 220 U. S. 559, 55 L. Ed., 582. It is also not disputed that both the plaintiff and the defendant were engaged in interstate commerce at the time the injuries are alleged to have been sustained. Upon the trial the jury returned a verdict for the plaintiff for $12,000. The trial judge overruled the motion of the defendant for a new trial, and it has brought this appeal in the nature of a writ of error.

The plaintiff was and had been for many years employed by the defendant, Railroad Company, as a switchman, his hours of work being from four P. M. until twelve o'clock. On the night of August 14, 1924, about ten o'clock, he was ordered to go upon the top of the freight train to release the handbrakes in order for the engine to move the train. The train was moving in a southerly direction in the yards at Columbia, in order to get out of the switch and then go north in the north yard on the main line. At the time of the accident in question the train was in the switch. Plaintiff testified that the third brake at the head end of the train was so tight that he could not release it, then he went over the train to the rear and let the brakes off at the rear end while the engine was standing still, then he started back to the head end of the train and the foreman of the switching crew gave the signal for the engineer to go ahead. He testified that then he knew that the engine could not handle the train with the third brake on the head end set, so he tried to get to this brake and release it. As he was doing so he stepped with his left foot into a place where a running board was gone. It was dark and he did not know of the defect of the running board. He was going quickly over the car in order to release the brake. The running board is composed of three planks running parallel from one end to the other of the car, the whole being about twenty inches wide and being level on top of the car. It rests on cross bars or ridge plates one and one-half to two feet apart. The plaintiff stepped off into the space where the running board should have been, some three or four inches below the level of the running

board. He said that he stepped into this place twice; that when he stepped in with his left foot he lost his balance. His toe was caught under a ridge board. When he lost his balance he fell off the end of the car through the opening between it and the next car, and he struck the ground between the rails. He was later found lying parallel with the rails near to the right-hand rail going south. The car was twelve to fourteen feet high. A witness, A. Richardson, another switchman, testified that after he had assisted in carrying the plaintiff to an ambulance, he went on top of this train and found the car with the running board partly gone, beginning about six or eight feet from the end of the car. He said that on the south end of this car about six or eight feet from the end "it began to tear up, part of it plum gone, excepting about two or three feet next to the other end that wasn't gone, one plank on the right hand side wasn't gone but had run back pretty near the center of the car, say third of it and curled up come loose." He said five or six feet of the running board was gone, that it was lacking from about two and one-half to three feet of the end of the car; that it left a sudden step-off three or four inches deep down to the sloping roof. He further said that if the running boards are all right, that is in proper condition, it is no trouble for an experienced switchman to pass along the top of them in a trot and that it was customary to do so; that Dillehay was on the train where he should have been and it was his duty to loosen the brakes on top of the train.

Another witness, Sewell, a car inspector, inspected these cars just after the accident. He found part of the running board on one car missing for three or four feet. This vacant place began from two to three feet from the end of the car.

The plaintiff in error sets forth in the brief of its counsel that it has never accepted the theory of Dillehay that he fell from the top of a moving car, went between it and the car attached to it head foremost, and also between the drawhead and the steel rail and was straightened out parallel with the rail in such a way as not to be struck on any part of his body by the wheels of the car from which he fell or the several other cars which he claims passed over him. It insists that this theory is contradicted by the physical facts and by the very nature of the injuries. There is no material evidence to contradict this theory of defendant in error, unless it appears that it was not possible for him to fall between the drawhead and the rail for lack of room for his body to pass through. Although this space was narrow it was not so narrow that he could not have fallen through it. His lantern was seen on top of the car from which he fell and was later found one hundred and fifty yards away from the point where he was found. When he

was found he was unconscious. His clothing was torn. In the absence of any other evidence it is impossible to conclude that his clothing was so torn otherwise than by the cars as they passed over him; or that he could have crawled between the tracks in an unconscious condition. These physical circumstances corroborate the positive testimony of Dillehay as to how he met with the casualty.

In dealing with questions of fact upon an appeal in the nature of a writ of error we must follow the well-settled rule that the complaining party is required to take as true the strongest legitimate evidence against it and show that it affords no support for the finding of the jury. Under this rule we must disregard all contervailing testimony. Railroad v. Howse, 96 Tenn., 119; Machine Co. v. Compress Co., 105 Tenn., 187; Railroad v. Witherspoon, 112 Tenn., 128; Wilson v. Alexander, 115 Tenn., 125; Lumber Co. v. Banks, 118 Tenn., 627. Of course, this rule is familiar to counsel, and we merely emphasize it as the method of dealing with the facts of the case. It results that we must accept the theory of the defendant in error that without fault on his part but through the defect in the running board, while in the discharge of his duty, he fell from the car and was injured. Under the aforesaid federal statutes the plaintiff in error is liable to him in compensatory damages for the injuries thus suffered by him. The serious question now to be considered relates to the character and extent of the injuries which were due to the fall from the car.

The defendant in error was forty-four years old and weighed 210 pounds at the time of the accident. For more than twenty years he had been in the service of the railroad company and he stood on the published honor roll for faithful service. A number of his nearest neighbors, as well as his wife and his family physician, testified that up to the time of the accident he was a very strong robust man; that he was in the prime of life. There is abundant evidence that he had lost no time on account of illness or other physical infirmity except that some years before he had had an injury to his foot from which he recovered. It appears that in January, 1925, nearly five months after the accident, he was examined by Doctors Manier and Nichol in Nashville and they found that his tonsils were somewhat large and ragged and showed evidence of chronic inflammation, his teeth were largely gone, and those remaining were diseased in appearance, with the definite recession of the gums and moderate pyorrhea. It is insisted that the condition, which will hereafter be explained and which rendered the defendant in error an invalid, was due to focal infection from his teeth and tonsils and not to the injuries from the accident.

The defendant in error was unconscious for about two hours as a result of the fall. He remained at the hospital in Columbia for two days and one night and a part of another night. He was then taken to his home where he remained until September 15, 1924, about five weeks, during which period he was attended by Dr. Robert Pillow, the local surgeon for the railroad company, and by his family physician, Dr. Covey. He was then sent to a hospital in Nashville, where he remained for about three weeks under the care of Doctors Duncan Eve and Duncan Eve, Jr., general surgeons for the railroad company. Upon his return home he was confined to his bed a part of the time. He made trips back to Nashville to consult Doctors Eve and continued under their treatment until about the 10th of January, 1925. When he first went to the hospital in Nashville X-ray pictures were taken of him. In January, 1925, further X-ray pictures were taken of him. Then he was examined by Doctors Nichol and Manier. About that time he employed Dr. O. J. Porter of Columbia as his physician and up to the time of the trial he had been constantly under the care of Dr. Porter. On the night before the trial he was given a careful examination by Doctors Porter, Yeiser and Ragsdale in Columbia. About a week before the trial X-ray pictures were taken of him by Dr. Jack Witherspoon of Nashville. It is practically undisputed that defendant in error has been an invalid since his fall; that he is almost a cripple as he walks with the aid of a stick; that he cannot work without pain; that his sleep is restless, being interrupted every three or four hours by waking; that he suffers with pinpricking sensations in his legs and hips; that these sensations can only be overcome by getting up and moving about, otherwise his legs cramp. He suffers more with his right leg and foot than with the left and his right leg seems to drag as he walks. He stands in a leaning posture and walks with his body bent. He cannot straighten his right leg. The muscles of the right hip and the inner side of his right thigh are especially affected. He is unable to work on his farm. At the time of the accident he was earning $160 per month. He was working every day. It is abundantly shown by the physicians, who qualified as experts, that his condition is permanent; that he will gradually grow worse by a steady physical degeneration; and that therefore, his earning capacity is terminated. It is therefore shown that he is physically an invalid.

Dr. Pillow testified that immediately upon his arrival at the hospital in Columbia, after the accident, he made a careful examination of the defendant in error and found that he had a slight laceration on the forehead and on the left point of the shoulder; that he also sustained a slight concussion of the brain but the effect of it

was only temporary. He found no evidence of any injury to his back or his hips or to any nerve or to the spinal cord. He did not think that defendant in error had any injury that would or could cause him permanent disability. When defendant in error was taken to the hospital in Nashville in the latter part of September, 1924, X-rays were made of him because his chief complaint was of his spine. These X-ray pictures were made by Doctors Hamilton and King, specialists in X-ray. Doctors King, and Duncan Eve, Jr., testified that these pictures showed no evidence of fracture or dislocation, but showed a condition known as spondylitis, or arthritis of the spinal column, due to infection, and inflammation of the fourth and fifth lumbar vertebrae, bringing about what they term "lipping" that is a growth of the bone to a sharpened condition, extending outward. Dr. Eve testified that the effect of a fall upon a spine so affected would be only to cause temporary discomfort and the fall would not act in any way on the process of the spondylitis, would not increase the disease at all but would only make the patient for the time being a little more uncomfortable. It was generally testified by the physicians that pyorrhea or infected teeth, and infected tonsils may produce arthritis, being inflammation of any joint, and spondylitis being the inflammatory condition of the spine. Doctors Eve, King, Manier and Nichol testified that in their opinion such condition is due to infection and not to a traumatic condition, or injury. Dr. Eve testified that during his first examination of defendant in error, the latter told him that during the winter before the accident he had suffered with rheumatism in his elbows and wrists and showed him that he only had eight or ten teeth, the others having been removed. These physicians testified that the formation of the bony substance at the point of the "lipping" is a very gradual process and could not be caused by any sudden act such as a fall or blow. Some of them said that they did not think that it would have been possible for this "lipping" to occur between August 14th and September 15th, because they did not think that there is any way by which any one acute injury of that kind could occasion any "lipping," and that in their opinion the condition of the spine did not result from the fall but antedated it. They thought that such a fall as the defendant in error endured would have no permanent effect upon the spondylitis from which he was suffering. However, Doctors Manier and Nichol were of the opinion that the injury sustained by the defendant in error may have had some harmful effect on the already existing spondylitis.

It is insisted that the verdict in this cause is based upon speculation, that it is guesswork on the part of the jury; that the evidence is in the alternative. That is to say, the condition of the

defendant in error may be wholly or in a large part due to focal infection instead of the fall, and therefore, the plaintiff below has not carried the burden of showing that his disabilities are due to the fall. If the evidence pointed to two possible causes, either of which may have been the producing cause of the disabilities, but with no more reason to ascribe it to one than the other, then the finding of the jury that the disabilities resulted from either of the two causes would be based upon speculation, or a mere guess, as to which of the two causes was the true one. A verdict cannot be based on a conjecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 242 S. W. R., 646, 648; Hart v. Union City, 107 Tenn. 294; Pryor v. Railway Co., 2 Hig., 198; Lucinda Hackner v. C. N. O. & T. P. R. Co., Knoxville, September Term, 1907, Mss. Opinion by Mr. Justice Shields; Patton v. T. & P. Railway Co., 179 U. S., 658, 45 L. Ed., 361; V. & S. W. Railway Co. v. Hawk, 160 Fed. R., 348; Williams v. Southern Railway Co., 130 N. C., 116; Hughes v. Railway Co. (Ky.), 16 S. W. R., 275.

It is insisted further that there is involved in this case an issue with respect to which a layman can have no knowledge at all, and which involves special knowledge and scientific training and experience so that the court and jury must depend upon expert evidence; that it can neither be discarded nor discriminated against, and where it is unanimous it is conclusive. This latter proposition will be especially dealt with in relation to an attack upon the charge of the trial judge, but it must be noticed in connection with the analysis of the evidence. If on the one hand there were testimony of some experts that the diseases of the spinal column and sacroiliac joint and the impotency of this defendant in error were due to focal infection alone and could not be due to any traumatic cause, and on the other hand there were testimony of experts merely that these conditions may be due to either cause, then the verdict of the jury could not be said to rest upon anything more than a mere conjecture. But we have in this record the testimony of other physicians equally expert and reputable which sets forth opinions ascribing these conditions to the fall instead of the focal infection. The testimony of the experts is far from unanimous, it is very conflicting.

Dr. Porter testified that a man falling from a freight car, being wrenched out and straightened on the ground, would from such a fall and contact with the ground suffer the very condition from which the defendant in error is suffering; that in the light of the facts of this case this is what did cause the condition or disabilities. It is true that his opinion was in part based upon the assumption that the defendant in error was a strong robust man up to the time of the injury, and the further assumption that he had no

symptoms of spondylitis prior to the injury; but as aforesaid, many witnesses testified that defendant in error was a strong robust man, in apparent full health up to that time; and although the defendant in error admitted to the physicians in Nashville that he had bad teeth and had had some rheumatism, there is no evidence of symptoms of spondylitis prior to the accident. Dr. Porter testified that in his opinion, even if his teeth were bad, pus formed, poison had emanated through his body but not so as to interfere with his daily vocation, such a trouble would not suddenly transform the defendant in error into his state of disability, for nothing but a gradual deterioration would happen under those circumstances. The testimony of Dr. Porter shows that he has made a very careful study of this case and the questions of pathology involved in it. He said that the immediate cause of his condition was the injury, trauma or wound, the fall from the freight car. He said that the condition of the defendant in error, in view of the sudden change on August 14, 1924, when he incurred the fall, could not be attributed to any arthritis coming from the teeth; that the arthritis was due to the accident; that it is conceivable that arthritis or spondylitis would come from infection but in his opinion the condition of defendant in error having been brought about so suddenly was due to the injury instead of infection. He said that the defendant in error was suffering from sacroiliac strain and spondlyitis a manifestation of pressure upon certain nerve structures, which is a symptom or result of spondylitis. The sacroiliac joint is a very deeply seated joint and so surrounded by bone, flesh and muscle that one cannot see it or reach it so as to determine the injury by either sight or touch; but it is determined by symptoms and the history of the case. Dr. Porter testified that the symptoms of spondylitis were determined by the inflammation bringing about the pressure on the nerves, causing the pouring out of new material in the neighborhood of the injury or disease, resulting in the partial closing of the openings around which this material may be laid down; and this is, in a measure, a process of ossification. He said that there was a fatty tumor on the right loin due probably to a blow on the skin, irritation setting up and starting the fatty tumor; that there was some little scarring of the skin over this small tumor; that there was a little difference in the muscular development of the two sides of the body, that is a little atrophy of the loin muscles on the right side, a tendency to shrink or perish; that these muscles were relatively a little smaller on the right side than on the left; that examination of the hip joint revealed that there was some roughness and a little projection, like cement, that might have oozed through a crack and hardened, two or three of them on each side a little rougher than was

normal; that in having him walk there was an obvious or involuntary tendency to drag the right leg due to stiffness of the muscles that draw the leg forward, a failure to respond to the will power at a normal rate. He further said that the symptoms indicated a hip joint strain. He further said that the defendant in error complained of symptoms which led him to conclude that there was an interference or pressure upon either the prolongation of the cord, which is the spinal marrow, which presides over the sensation and motion of the lower extremities; that the needle and pin-pricking sensations in the legs and the chronic headaches, of which the defendant in error complained, led to the conclusion that the nerves supplying the parts so affected are in some way interfered with; that it is usually due to pressure from without, to hemorrhage or to a fracture, or to new material which is thrown around the holes through which the nerves emerge from the spinal cord becoming what is called scar tissue; that this will bring about cramping sensations after a time. He further said that the defendont in error was unable to straighten his right leg. Dr. Porter further said that the bony formations called "lipping" shown in X-ray photographs can come about within a space of thirty or thirty-five days; that the inflammatory condition called spondylitis or arthritis can be caused by a severe blow or wrench. He was of the opinion that the disability was permanent and would be progressively worse; that the most obvious subsequent effects would be the gradual stiffening of certain muscle groups that are supplied by the injured nerves, gradual hardening of the muscles and their loss of elasticity and their inability to extend and contract; that a person in such condition would be subject to considerable pain and there was a possibility of final inability to walk.

In all of these explanations and expert opinions Dr. Porter is corroborated by Doctors Ragsdale and Yeiser. Doctors Yeiser and Ragsdale examined the defendant in error only once and that was the night before they testified, in December, 1925. Dr. Porter was present with them. The opinions of Doctors Yeiser and Ragsdale were formed and expressed independently of the others. They base these opinions upon their careful examination of the defendant in error and upon the history of his case as obtained from him and Dr. Porter, as well as the interpretation by Dr. Witherspoon of the X-ray pictures. Their descriptions of the physical condition of the defendant in error, the nature of his injury and disease, were in harmony with those given by other physicians who had previously examined or treated him. Dr. Ragsdale, upon the assumption that defendant in error was a man of practically good health, strong and robust until the time of his fall, and that he did have such fall from the top of the car and was wrenched

so as to be stretched out along the rail, testified that in his opinion the condition of the defendant in error as he found him and as it had been from the time of the accident, was due to the fall. He further testified that such a fall and strain would produce inflamed condition, that is spondylitis; and that it surely could be brought about within a space of thirty or forty days. When asked, if in view of the history of the case, infected teeth or any other poison in the system could have brought about the injury to the nerves as he found them, he said that it could not; that the condition of the defendant in error was caused by the fall and the resulting inflammation. He said that the condition of the teeth and tonsils would not produce the sudden change. He pointed out that X-ray photographs do not show such injuries to the spinal cord and the nerves coming from it or the sacroiliac joint, or to soft structures, as existed in this case.

Dr. Yeiser also set forth the symptoms of atrophy of the muscles, inability to control the hip causing the defendant in error to stoop over and walk by dragging one foot, and the symptoms of injury to the nerves. He testified that the right leg was principally affected, especially the muscles of the hip and the inner side of the thigh, making it impossible to straighten the leg; that the nerves coming out of the sacrum or hip are impaired; that the defendant in error would in his opinion drag his foot more and more; that his condition will grow worse gradually by a physical degeneration. He was of the opinion that a severe fall, or blow, or strain, or wrench of the back along the lumbar region would produce the condition of the nerves which he found and he did not say that the fall from the freight car caused the condition of defendant in error, but he said that in his opinion the fall would have brought about the condition.

The testimony of all the physicians goes into great detail and it is unnecessary to set forth more than this analysis of it. It is insisted that because the testimony of Doctors Porter, Ragsdale, and Yeiser was based in part upon the history of their patient, it should not be regarded as material evidence that the fall was the cause of the condition, in view of the testimony given by the physicians called by the railroad company. But these physicians made a very careful examination of the defendant in error, and it does not appear that they did not have before them a true history of his case, with the exception that they probably did not know that he had admitted that he had some rheumatism of his wrist joint. However, they took into account the whole question of causal connection between the condition which they found and infected teeth or bad tonsils. They testified, as aforesaid, that there were certain conditions which the X-ray would not show but which

were determined by their own inductive process of reasoning from symptoms well recognized as due to the troubles which they described. We have here in great detail the conflicting testimony of experts, all of them reputable and skilled and even eminent in their profession. The jury, as the judges or triers of facts, have chosen to believe that the testimony of the physicians called by the defendant in error that his fall from the car was the cause of his disability, was true. In addition they believed that the defendant in error was a strong robust man until he fell from the car and they evidently concluded that his sudden physical transformation, or physical ruin, was not due to any gradual process of focal infection. They must have believed that the violent fall had caused a wrench or derangement of the nervous system and muscles in the parts affected, which was permanent in character and would be progressively worse. We are unable to conclude that there is not material evidence to sustain these conclusions. The trial judge instructed the jury correctly and very fully upon this whole insistence by the plaintiff in error that at the time of the accident and prior thereto the defendant in error was suffering from a disease or diseases which were the proximate cause of some or all of his injuries. He instructed them that if they should find that he was suffering from disease at the time of the injury, that on account of his diseased condition he was less able to sustain the force of the fall or injury, nevertheless the railroad company would be liable for all damages resulting from its negligence even though the damages might have been greater on account of the defendant in error being in a weakened condition than they otherwise would have been; that the plaintiff would be entitled to recover for the damages which the negligence of the railroad company caused to him in the state in which he actually was, whether in a sound or unsound physical condition, but the company would not be liable for the result of disease which would have occurred and did not occur independent of the fall. The trial judge went carefully into detail instructing the jury upon this phase of the case. He instructed them that they could not separate the damages or theorize about them, and that where the evidence was so conflicting that they could no tell what the facts were, or what caused the injury, if any, then they could allow no damages on account of these disputed matters, for they could give compensation only for damages proven by a preponderance of the evidence to exist and to have been caused by the accident. In these instructions he followed accurately the law as laid down by the Supreme Court in the case of Elrod v. The Town of Franklin, 140 Tenn., 240. The jury thus had before them these rules very carefully explained and with these full instructions they considered the physical facts and

adopted the opinions of the physicians, that the fall from the car was the proximate cause of the disabilities of the defendant in error.

Closely related to these questions is the insistence of the plaintiff in error that the trial judge erred in instructing the jury as follows:

"The testimony of a number of physicians has been introduced for your consideration. Some of these have testified to facts and circumstances like other witnesses, and some have testified as experts, and have been permitted to give their opinion upon certain scientific questions. The testimony of these witnesses and their opinions have been admitted for your consideration, because it is presumed under the law that they are more familiar with subjects under consideration than people who are not trained in medical science and the methods of treating diseases and injuries.

"In considering the testimony, you will bear in mind that it more or less invades the field of speculation and theory, and you should receive the same and carefully consider it. You are not bound by the opinion of these doctors upon these scientific and medical questions, but you will weigh and consider the same along with all the other testimony in the case, and give it such weight and credit as you think right and proper under all the facts and circumstances developed in the proof."

It is urged that these instructions unreasonably discriminate against the testimony of physicians and surgeons; that there was involved in this cause an issue with respect to which a layman could have no knowledge at all and which involved special knowledge and scientific training and experience, and as to which the court and jury must depend upon expert evidence. It is urged that medical witnesses only could answer the question as to the cause of the disability, that the trial judge discriminated against such evidence, that he should not have done so, and that he instructed the jury erroneously that they were not bound by the evidence of the physicians upon medical and scientific matters. It is insisted that the judge may caution the jury in regard to expert testimony, but that not even a caution is justifiable when the matter at issue depends exclusively upon scientific opinion. The testimony of Doctors Porter, Ragsdale and Yeiser is criticised on three grounds. First, the defendant in error's condition might have been caused by focal infection not due to the fall, therefore, leaves the matter in doubt and lets the jury guess; second, no one of these physicians discovered by examination or by X-ray examination, any definite evidence of such injury; third, in order to arrive at their opinion they accepted the statements of the defendant in error both as to prior health and present infirmities, as true. The conclusion is reached that therefore, unless the statements were true their diag-

nosis was false. It is further urged that his statements were not true as established by his own admissions by his statements to Doctors Eve, Manier and Nichol and as borne out by his teeth and tonsils; and that with these facts before him the trial- judge virtually said to the jury:

"You are at liberty to discard the testimony of Doctors Eve, Nichol, Manier and King, the X-ray plates, the admissions of the plaintiff himself as to his teeth and rheumatism, and accept his broad statement that prior to the accident he was a perfect man."

The evidence in this record, that defendant in error was a strong robust man, to the extent that he was able to work efficiently every day, until he incurred the fall, must be accepted as true. This was fully known to Doctors Porter, Ragsdale and Yeiser when they became acquainted with the case. When they gave their testimony they were aware of the claim that the defendant in error had spondylitis at the time of the injury. While to them it was conceivable that the condition was brought about by disease due to infection, nevertheless Doctors Porter and Ragsdale were positive in their opinion that because of the strain upon the hip joint and other conditions shown by symptoms, the condition was due to the fall. Along with this opinion evidence was the fact of a sudden and violent transformation in the man's physical condition. This was clearly shown to the jury as well as to the experts. The jury adopted the view from these physical facts and from the experts' opinions, that the transformation was not due to previous infection from teeth and tonsils but was due to the fall. It, therefore, must be concluded that the issue was not one about which a layman could have no knowledge at all. There is evidence that certain conditions of the body could not be clearly shown by the X-ray. Doctors Nichol and Manier were of the opinion that the spondylitis, if it existed at the time of the fall, might have been made worse by the fall. The admissions of the defendant in error relied on were, if made, that he had had some arthritis or rheumatism in his elbow and wrist. It is undisputed that a person may have infection of teeth and tonsils which may never extend to the spinal cord and hip joint. The jury evidently took these matters into consideration.

The testimony of the medical witnesses was, as has been shown, very conflicting. The X-ray itself did not furnish a complete scientific demonstration. The process of inductive reasoning from known facts, or symptoms, to causes, is the method by which scientists must reach conclusions. It is the standard method of arriving at truth, and by it the achievements of science have been largely accomplished. It is sometimes applied with false reasoning, but the fault is in the application of the method. As in this case

the scientists and the expert witnesses may disagree. The jury are the triers of the facts and must reach conclusions. Expert testimony is valuable as an aid to these conclusions. Where the experts disagree, it is impossible to instruct them that they must accept without question the opinions of any one set of witnesses, because that would be an invasion of the province of the jury. The cases cited for plaintiff in error are cases from other jurisdictions, and in which there was no room for the exercise of common knowledge as against the undisputed testimony of experts—such as malpractice cases where only a physician could show what constitutes ordinary care and skill in the medical or surgical treatment, or cases involving intricate mechanical manipulation where only experts could throw any light upon the issues. But here with the conflicting testimony of experts we have also certain physical facts which the jury had a right to take into account. In 11 R. C. L., 586, the following rules are laid down supported by many cases:

> "In many of the decisions holding expert evidence inadmissible if it consists of an opinion on the ultimate fact in issue, it was assumed that the expert opinion would be conclusive upon the jury and so take from them the power and duty of deciding the issue. But whenever such conclusive effect has been directly claimed for expert testimony it has been denied. The knowledge, experience and impartiality of the expert witnesses are open to the strictest scrutiny by cross-examination, and it is then the duty of the jury to give it such weight as it is entitled to from the ability and character of the witness, and the weight of the reasoning by which he has supported his opinion. Even if several competent experts concur in their opinion, and no opposing expert evidence is offered, the jury are still bound to decide the issue upon their own fair judgment assisted by the statements of the expert."

In our system of trial by jury the rule generally adopted as to expert testimony was well expressed by the Supreme Court of Iowa in the case of Moore v. Chicago, etc., Railroad Company, 151 Iowa, 353, 131 N. W., 30, as follows:

> "The jury does not sit simply to register the opinion of an expert witness even if it be undisputed. It is its own exclusive function to pass upon the fact put in issue. The testimony of the expert may not be arbitrarily rejected, but, like the evidence of every other witness, it is to be considered by the jurors who are to accord to it influence, much or little, according as it appeals to their intelligent and impartial minds in view of all the facts and circumstances developed on the trial and the common knowledge and experience of mankind."

In Jones on Evidence, Vol. 2, sec. 392, it is said:

"When the testimony consists of mere inferences from assumed facts, of opinions against opinion, and especially of the opinions of those zealous witnesses who betray the bias of the advocate, it may be highly proper for the court to caution the jury against the dangers of such evidence. The cases already referred to sufficiently illustrate the rule that the jury must, in passing upon expert testimony, like other testimony, finally determine the degree of weight to which, under all the circumstances, it is entitled. It is for the jury to estimate the value of the opinion and accept or reject it; it is for them to find the facts on which it is based, true or untrue; they are to regard the opinion simply as a sort of super structure imposed upon a hypothetical foundation, which stands or falls with its supporting facts.—In the light of an aid to the jury, expert testimony is assuredly valuable. The opinions of experts, unchallenged and established in the mind of the jury by proof of the constituent facts, are entitled to consideration the same as other evidence which has gone to the jury. Nevertheless, when the jury are told that the expert evidence is advisory only, and not binding on them, that they are not to surrender their own convictions but they should accord to such evidence such weight as they believe from all the facts and circumstances in evidence the same are entitled to receive, full justice has been accorded to the class of testimony we are dealing with."

In Wigmore on Evidence, Vol. 3, sec. 1917, the learned author summarizes his historical discussion of opinion evidence by showing that the ground of the old objection to such evidence lay in view of "mere opinion" as a guess, and belief without good grounds; but that in the modern sense "opinion" is an inference from observed and communicable data. The opinions given by the witnesses in this cause are not mere opinions or guesses but they are inferences from observed and communicable data.

The rules above quoted do not seem to be contrary to the valuations of opinion evidence disclosed in our Tennessee decisions upon that subject.

In Person v. State, 90 Tenn., 291, it was held that it was highly proper in the trial judge to instruct the jury in a murder case to scrutinize the testimony of experts; that it was his duty to instruct them to look to their character, manner and capability; to the circumstances that brought them in as witnesses, to the fact of compensation and to what extent, if any, under all the circumstances their credibility might be affected thereby; but it was error to say, in almost direct terms, that while the medical experts in-

troduced by the defendant were admissible in law as witnesses, they were not entitled to credit. In the case before us the trial judge did not go to such an extent but instructed the jury that they should weigh and consider the opinions of the physicians along with the other testimony in the case.

In Wilcox v. State, 94 Tenn., 106, the instruction complained of was as follows:

"While expert testimony is sometimes the only means of, or the best way to reach the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties and requires patience and intelligent investigation to reach the truth."

The court said that this was only the closing extract from a long and lucid charge as to the weight to be given to such testimony both that of non-expert and expert, and that the whole was substantially in conformity with the rule laid down that expert testimony is to be received with caution. It was held that the opinions of expert witnesses should be received with caution and investigated with care.

In Bateman v. Ryder, the court approved again the charge to a jury that they should receive the testimony of experts with caution.

In Atkins v. State, 119 Tenn., 458, a charge of the trial judge stating that while expert testimony is sometimes the only or best means to reach the truth yet it is largely a field of speculation beset with pitfalls and uncertainties, and requires patience and intelligent investigation to reach the truth; and instructing the jury to receive it with caution but to give to it such weight as they give to the other testimony, having in view a purpose to arrive at the truth, giving an impartial estimate of all the evidence, was held not to discriminate against the expert testimony and not erroneous.

In Fisher v. Insurance Company, 124 Tenn.. 450, the foregoing cases were reviewed and the court said:

"This court, by the cases already cited, is thoroughly committed to the doctrine that such evidence must be received with caution, and where it is paid for it must be received with great caution, but further than this, we have not gone. There is evinced in the case of Atkins v. State, an inclination to bring our authorities, as nearly as possible, into line with the current of authority without, in terms, modifying the prior cases. We do not think that any of these cases would justify the trial judge in warning the jury that they must not be misled or confused by expert testimony. We think this is discriminating too heavily against that class of evidence and that the trial judge committed error in this respect. We also think that he committed error in charging, in respect of all of the

expert testimony in this case, that it must be received with great caution.''

The rule supported by the current of authority to which the court manifestly referred, was set forth in the opinion in that case in a quotation from Elliott on Evidence, Vol. 2, sec. 1047, as follows:

''The better rule, and that which seems to be supported by the weight of authority, is that the opinions of experts are not conclusive, at least where there is other evidence from which a contrary conclusion may be legitimately drawn; nor on the other hand are they necessarily entitled to less weight than other evidence, and it is error to instruct the jury that they are entitled to less weight and must be received with caution. They are in general to be received and weighed by the jury like other evidence. Some courts, however, have held that it is not error to instruct that they are not entitled to the same weight, or that they should be received with caution.''

Testing the instructions in question by the rules given by the Supreme Court in these cases, and by the texts from these learned writers, we are of the opinion that they were not erroneously given. Certainly, under these authorities and in view of the facts of this case, the jury were not bound by the opinions of the doctors. It was proper to instruct them that they should weigh and consider these opinions along with the other testimony in the case and give them such weight and credit as the jury might think right and proper under all the facts and circumstances developed in the proof. The trial judge did not even use the word caution. He told the jury to receive the expert testimony and carefully consider it. His statement that it more or less invades the field of speculation and theory is merely a caution against the infirmities attached to this particular species of evidence, and such instruction was specifically approved in Atkins v. State, supra.

We, therefore, conclude that the instruction in question did not erroneously discriminate against this character of testimony. Nor was this a case in which the jury were compelled to look alone to evidence of the physicians upon medical and scientific matters in order to determine the issues. The instruction complained of, moreover, would not have discriminated against the experts called by the plaintiff in error more than against the experts called by the defendant in error. The trial judge correctly instructed the jury concerning such evidence and they were left free to choose between the conflicting lines of expert evidence, or to reject them.

It is insisted that the trial judge erred in instructing the jury that the law provides that all cars requiring ladders and secure running boards shall be equipped with such ladders and running

boards; on the ground that the meaning of the word "secure" is not defined. But the trial judge also instructed the jury as follows:

"He (plaintiff) insists that the running board on top of the car, and walk-way for brakemen along the top of said car, was in a defective condition, having a broken plank therein, and that this defect was the proximate cause of the plaintiff stumbling and falling from the top of said car to the ground resulting in said injury. The plaintiff insists that defendant Company's failure to have said running board in safe condition required by law was ·the proximate cause of his falling and injuries."

Further in his charge the trial judge made it very plain to the jury that the defect complained of was the want of one or more of the planks of which the running board was composed. We cannot see how the jury could have been misled or could have misunderstood the meaning of the word "secure" with reference to the running board.

It is insisted that the trial judge erred in charging the jury as follows:

"It is insisted by the defendant that at the time of the accident and before· that, the plaintiff was suffering from a disease, or diseases, which was the proximate cause of some or all of his injuries."

The point made is that the defendant was insisting that the plaintiff was suffering from a disease which was the sole cause of his condition, not of his injuries, but the trial judge further told the jury that if they should find that at the time of the accident or fall, or since that time, the plaintiff was suffering from a disease or diseases or physical defect which was responsible for his condition or a part thereof, then the defendant company would not be liable for the defects or damages caused by these diseases, if any, which were the proximate results of the disease or physical defects arising from causes other than the fall.

We are unable to believe that the jury could have been misled by the use of the word "injury" instead of the word "condition," and especially when the trial judge made it plain in the latter part of this instruction that he was referring to the condition of the plaintiff below. The trial judge was very properly pointing out to the jury the issue whether the disabilities of the plaintiff were due to the fall or to disease. We are unable to see how the jury could have been led by these instructions to believe that the defendant railroad company was insisting that the plaintiff was suffering from a disease which caused him to fall from the car in question and had caused his injuries.

It is assigned as reversible error that counsel for the plaintiff below improperly appealed to the jury to return such a verdict as would provide for the wife of the plaintiff and educate and care for the little children. It was in evidence that plaintiff had a wife and some children. While these are not elements of damage to be considered in making up a verdict, the only effect of such improper appeal would be to emphasize what might already be in the mind of the jury. In our opinion this emphasis was fairly destroyed by the court instructing the jury, upon request of the defendant, that in considering the amount of damages the plaintiff might be entitled to recover, they should not consider the plaintiff's wife and his children or anything of which they were deprived. But there is really no evidence in the record to which the court can look with reference to such conduct of counsel. The only recital of it is in the motion for a new trial. Recitals of fact in the motion for a new trial are not evidence because such motion is merely a pleading and is not evidence of what occurred on the trial. Sherman v. State, 125 Tenn., 149; Richmond Type & Electrotype Foundry v. Carter, 133 Tenn., 493; Assurance Co. v. Feed & Grocery Company, 122 Tenn., 652.

In view of our foregoing interpretation of this case, and of the facts set forth as to the nature and extent and permanency of the disabilities under which the defendant in error is suffering, the pain endured, the inability on his part to work and earn a living; the hopelessness of his condition, we are unable to sustain the assignment that the damages awarded are excessive. While the amount awarded is a substantial sum, it is not unreasonable in view of the age and earning capacity of the defendant in error.

All of the assignments of error are overruled. The judgment of the circuit court is affirmed. A judgment will be entered in this court in favor of the defendant in error against the plaintiff in error for the sum of twelve thousand dollars, with interest from the date of the judgment, in the circuit court, and costs incurred in said court. Judgment will be entered against the plaintiff in error and the surety on its appeal bond for the costs of its appeal and damages, to-wit, interest on the amount of the judgment from the date of rendition thereof in the circuit court.

Faw, P. J., and Crownover, J., concur.