# ACT-O-LANE GAS SERVICE CO., Inc. v. CLINTON et ux.—245 S. W. (2d) 795.

Eastern Section. January 10, 1951.

Petition for Certiorari denied by Supreme Court, August 31, 1951.

444

Strang, Fletcher & Carriger, of Chattanooga, for plaintiffs in error.

Steven C. Stone, of Chattanooga, for defendants in error.

HOWARD, J. Referring to the parties as they appeared in the court below, the plaintiffs, Mr. and Mrs. Julius Clinton (husband and wife), jointly sued the defendant, Act-O-Lane Gas Service Co., Inc., for damages to both real and personal property resulting from an alleged breach of contract. There was a jury verdict for the plaintiffs from which the defendant appealed to this court, assigning errors which will be hereinafter considered.

At the time the matters herein arose the plaintiffs were residents of the State of Georgia, living at or near Tunnel Hill, on Highway 11, about 20 miles south of Chattanooga, where they owned a modest four-room home which was formerly heated with an oil stove and a coal heater. Clinton was regularly employed as a boiler repairer for a Chattanooga concern, and out of town work compelled his being away from home continuously for periods of from four to five months. Mrs. Clinton was also employed as a supervisor at a chenille plant located across the highway from their home, and except at night and on weekends she was seldom at home. It appears that she kept at her home a large quantity of materials from which chenille garments or products are made, as well as several of the machines used for making said products, and that some of these finished articles were kept in her home for sale to the public.

The defendant corporation was organized in 1947 with its principal office at Chattanooga, Tennessee. It has subsequently engaged in the sale and distribution of propane gas and various types of household appliances in which said gas was used. The facts are undisputed that in May 1947 the defendant's agent entered into a contract with plaintiffs to sell them certain household appliances and propane gas to be used in connection

therewith, at a total cost, including installation, of nearly $1,000, for which plaintiff, Julius Clinton, signed two title retention notes payable in 12 and 36 monthly installments.

Taking up the defendant's assignments, it is first insisted that plaintiffs adduced no material evidence to support the verdict, and that the trial court erred in refusing to sustain the defendant's motion for peremptory instructions made at the conclusion of all the evidence. In considering whether or not there is any merit in the defendant's insistence, we must take the strongest legitimate view of the evidence in favor of plaintiffs, construe it most favorably to them, and indulge all reasonable inferences to uphold the verdict. Western Union Tel. Co. v. Lamb, 140 Tenn. 107, 203 S. W. 752; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984; Osborn v. City of Nashville, 182 Tenn. 197, 185 S. W. (2d) 510; Good v. Tennessee Coach Co., 30 Tenn. App. 575, 209 S. W. (2d) 41, 43. Applying the foregoing rule to the evidence presented here, we think that this assignment is without merit.

According to the plaintiffs, the defendant's agent, Holbrook, represented that the gas was a good, dry gas and that it would produce a clean dry heat, better than any other heat on the market; that the gas was represented to be hotter and better for heating purposes than either coal, electricity, oil or natural gas, and that it would be much cleaner and drier than their present type of heat; that the gas was represented to be so hot that it would consume the moisture, if any, and there would be no fog on the windows, and that three heaters used singly or collectively would adequately hear their home; that upon these representation they purchased from defendant three unvented space or room heaters, a

gas range and a gas refrigerator, which were delivered and installed in their home with the necessary pipe connections to a tank outside the house where the gas was stored, and that defendant's agents gave them no instructions as to how the gas should be used or how the appliances were to be operated; that during a cool spell in October 1947, Mrs. Clinton started the bedroom heater, and that within twenty or thirty minutes the windows of the house were covered with fog; that because she was away from home during the daytime she burned only her bedroom heater at night, except occasionally when company came in she would burn two of the heaters. Noticing the moisture, Mrs. Clinton stated that she immediately called Holbrook on the telephone and complained to him about the condition; that Holbrook came out and on seeing the moisture stated that he didn't know what was causing the trouble unless there was some water in the gas tank; that shortly thereafter the heater in the bedroom got out of order and wouldn't burn, and Mr. Core, defendant's superintendent, discovered that the flow of the gas had been cut off by ice forming in the pressure reducing valve on the heater, and that by removing the ice the condition was corrected, but not for long as it subsequently occurred several times.

Mrs. Clinton stated that Holbrook, on one of his frequent visits, told her that defendant's heating engineer, Lambert, had gone out of the city to ascertain the cause of the dampness and that upon his return he (Lambert) would try to find out what was causing the moisture in her home, and that later Lambert, in discussing the matter with her, said: "Mrs. Clinton, to save my life I have no explanation for this moisture"; that around Christmas 1947 when the gas was again cut off by ice forming in the pressure reducing valves, Lambert

sent out one of the defendant's employees to put alcohol in the gas tank, but this did not prevent the gas line from freezing, nor did it eliminate the moisture; and that neither Lambert, Holbrook nor any of the defendant's agents ever said anything about ventilating the house by raising or lowering the windows while the heaters were burning.

Upon discovering that the moisture was damaging everything in the house, including the materials and machinery used in manufacturing chenille products, Mrs. Clinton said that she requested defendant's employees to remove the heater from the back bedroom into the kitchen, and that said employees also removed one of the closets in the house in an effort to eliminate the dampness, but that neither of these moves improved the situation.

The plaintiffs testified that after using the gas several times they discovered everything in the house was damp and covered with moisture; that the bedclothes became so damp they felt like they had just come off the clothes line, the freshly washed and ironed curtains became limp, and their personal clothes and the bedclothes mildewed and lost color. They said that streaks appeared in the paint on the walls and woodwork, and that the walls were damp like a cave; that the furniture which had been put together with glue came apart, the veneer buckled and peeled off, and the rugs on the floors became so damp they mildewed; that a large number of chenille garments as well as valuable materials from which the garments were made became damp and mildewed, were unsalable and could not be used, and that the machinery was damaged to such an extent that it was practically worthless.

Plaintiffs' testimony regarding the cause and extent of their damages was not controverted by the defendant. The record reveals that about 7 per cent of the defend-

ant's customers in the Chattanooga area complained about the excessive moisture produced by the gas.

Defendant introduced three witnesses who qualified as experts in the Petroleum Industry. These witnesses testified that all gas in burning gave off moisture in the form of water vapor, but that this did not result from any defect in the gas but was the result of the normal operation of the laws of nature; that propane gas contained only a very small percentage of water, and that it was impossible for the gas to produce any great amount of moisture. They said that the moisture in plaintiffs' home resulted from the improper use of the gas and heaters; that plaintiffs purchased individual room heaters and that if they had used all the heaters at one time to heat the house instead of only one, that the results would have been satisfactory. They explained that plaintiffs' house got cold at night as well as in the daytime while they were away, and that when the warm air produced by the heater came in contact with the cold air a certain amount of fog or condensation was created, particularly noticeable on the windows, and that this condition could have been remedied by proper ventilation such as raising or lowering the windows.

It is urged on behalf of the defendant that the trial court should have directed a verdict on the undisputed expert testimony of its witnesses. In the light of the plaintiffs' proof we are unable to agree with this insistence. Besides, none of these witnesses ever visited plaintiffs' home and they had no personal knowledge of the conditions existing there, and one of them, a Mr. Ames, Chief Chemist of the Esso Standard Oil Company of Louisiana, admitted that in 1947 his company shipped three cars of gas to the defendant, and that these cars arrived at defendant's plant in October. He testified

that the gas included in these shipments had failed to pass the Cobalt Bromide test, commonly referred to as the moisture test, a scientific method used to ascertain the water content in propane gas, and defendant's records showed that defendant sold and delivered to plaintiffs more than 450 gallons of gas during the months of October and November. Witnesses for the defendant admitted that when the gas contained water the pressure reducing valves on heaters would freeze and that the pouring of alcohol into the gas tank was one of the means of eliminating moisture. Furthermore, Lambert, defendant's engineer, did not testify and his statement to Mrs. Clinton that he was unable to ascertain the cause of the moisture went unchallenged. Where there is a conflict between expert or scientific testimony and testimony as to facts, the jury must determine the relative weight of the evidence. 20 Am. Jur. Sec. 1208, p. 1059; 32 C. J. S., Evidence, Section 572, page 416. Any material fact may be established by either direct or circumstantial evidence. McMahan v. Tucker, 31 Tenn. App. 429, 216 S. W. (2d) 356. And, ''The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent therewith.'' Nashville, C. & St. L. Ry. Co. v. Jackson, 187 Tenn. 202, 213 S. W. (2d) 116, 122.

 Holbrook, defendant's agent who negotiated the sale with plaintiffs, denied that he failed to give plaintiffs instructions as to how the heaters and gas should be used; denied that he represented the gas to be a clean, dry gas and that it would produce a good, clean, dry heat, and denied that Mrs. Clinton had ever complained to him at any time about the excessive moisture, but that she had repeatedly told him that she was entirely satisfied with the heat and that on two or three occasions she gave him

the names of parties as prospective purchasers. Inasmuch as Holbrook's testimony was in direct conflict with that of plaintiffs, it was for the jury to say which witnesses they would or would not believe. Archer v. Archer, 31 Tenn. App. 657, 219 S. W. (2d) 919; Marable v. State ex rel. Wackernie, 32 Tenn. App. 238, 222 S. W. (2d) 234; Sepaugh v. Methodist Hospital, 30 Tenn. App. 25, 202 S. W. (2d) 985; Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806. Likewise, it was for the jury to say whether or not the gas was misrepresented by the defendant's agent.

█ It is urged that the trial court erred in refusing defendant's motion for a special jury to try the case because of the nature of the issues involved; that the technical testimony of defendant's expert witnesses was beyond the clear understanding and comprehension of the average juror. Code, Section 10040 provides that "a special jury may be ordered and summoned, if, in the opinion of the court, it is proper." Under this section the right to a special jury is not absolute but is within the exclusive discretion of the trial court whose judgment is not reviewable "as the statute lays down no rule by which the court is to be governed." Clingan v. East Tennessee, V. & G. Railroad Co., 70 Tenn. 726.

Complaint is made that the trial court erred in refusing to grant defendant a new trial because of the alleged misconduct of the jury. This assignment is based on information contained in affidavits of two of the jurors as follows:

"(1) It was insisted in the jury room, in substance, that it was evidence of the defendant's guilt and liability, that defendant had delayed the trial so long, and had obtained orders passing the case so many times, and that the defendant had been trying to wear out the plaintiffs;

452

"(2) That it was argued, in substance, that the defendant was negligent in not giving sufficient instructions as to the use of the heaters and should respond in damages;

"(3) That the defendant should have taken steps to correct the freezing of the pressure reducing valve and that defendant was negligent in not doing so because the condition of occasional freezing of the valve was dangerous to life."

By their affidavits the two jurors endeavored to impeach their verdict. Except in rare instances such attempts are futile. It is the general rule that jurors will not be permitted to impeach their verdict and to stultify themselves by later making affidavits, the substance of which shows that they did not fairly try the case as they had taken oath to do. Wade v. Ordway, 60 Tenn. 229; Dunnaway v. State, 62 Tenn. 206; Harbin v. Elam, 1 Tenn. App. 496; Tennessee Eastern Electric Co. v. Link, 6 Tenn. App. 617; Williamson v. Howell, 13 Tenn. App. 506; Fidelity Bond & Mortgage Co. v. American Security Co., 14 Tenn. App. 211; Colonial Baking Co. v. Acquino, 20 Tenn. App. 695, 103 S. W. (2d) 613; McAlester v. Monteverde, 22 Tenn. App. 14, 115 S. W. (2d) 257; Lee v. State, 121 Tenn. 521, 554, 116 S. W. 881; Waller v. Skelton, 31 Tenn. App. 103, 212 S. W. (2d) 690, 698.

In Lee v. State, supra [121 Tenn. 521, 116 S. W. 890], our Supreme Court said: "* * * but it is insisted that the facts disclosed in this affidavit show that the jury did not arrive at their verdict by a correct process of reasoning, that they resorted to facts not proper to be considered, and upon principles not applicable to the case, and that for this reason a new trial should be granted. If this rule were adopted, but few verdicts would be permitted to stand. Jurors may arrive at the same con-

clusion, and render the same verdict, but the influences that control their minds, and the process of reasoning by which they arrive at their conclusion, are as diverse as the human mind itself; and the argument and reasons governing each juror in rendering his verdict might not always be found the most logical, or in accordance with the views of the court. If no error of law was committed, if the jury were guilty. of no misconduct, *if the verdict they render is supported by the evidence, this court could not set it aside upon the affidavit of a juror that he reached this result by erroneous reasoning, or from considerations that should not have influenced him, but will presume that the result arrived at was the legitimate result of the law and the facts.*'' (Emphasis supplied.)

With reference to the weight and credibility of the testimony of expert witnesses, the able Circuit Judge instructed the jury as follows: ''Expert witnesses have testified in this case, and the Court charges you that you are to consider their testimony as you would any other witness in the case, giving to it such weight and credit as you think it is entitled to. You are not bound by the testimony of any witness whether expert or non-expert, but you weigh what they have said, and consider their interest or want of interest, their manner of testifying, the same as you would any other witness, and give their testimony such weight and credit as you think they are entitled to just as you would any other witness in the case.''

██ ██ It is argued that this portion of the court's charge was prejudicial to the defendant for the reason that the issues involved scientific principles and knowledge, and that the expert testimony was undisputed in regard to these matters; that under the circumstances there was no reason for the exercise of common knowl-

edge on the part of the jury. Because of the conflict between the defendant's expert testimony and the plaintiffs' proof as to the facts, the court's charge was a correct statement of the law applicable to expert witnesses. Louisville & N. R. Co. v. Dillehay, 3 Tenn. App. 476. Where there is a conflict between expert testimony and testimony as to facts, the jury is not bound to accept the expert testimony in preference to the other testimony, but must determine the weight and credibility of each in the light of all the facts in the case. Standard Oil Co. of Louisiana v. Roach, 19 Tenn. App. 661, 94 S. W. (2d) 63; 20 Am. Jur. Sec. 1206, p. 1056, Sec. 1208, p. 1059; 32 C. J. S., Evidence, Section 572, page 416. See also Mullendore v. State, 183 Tenn. 53, 191 S. W. (2d) 149.

 Defendant complains of the trial court's refusal to charge the following requests: (4) "That if you find that there was a breach of contract * * *, and that the plaintiffs were damaged as a proximate result thereof, * * * then as to that damage you will return a verdict for the plaintiff provided you can arrive at the amount * * * without resorting to speculation or guess * * * and if under the proof * * * you find it impossible to determine such damages without resorting to guess or speculation, then * * *, your verdict will be for the defendant." (6) "If you find from the evidence that there are two equally probable causes of the damages * * *, for only one of which defendant is responsible; and if you find that in order to determine the cause of the damages you would have to resort to guess or conjecture or speculation then your verdict must be for the defendant." We find no error in the court's refusal because the substance contained in the requests had already been amply covered in the general charge. To

deny a special request, the substance of which has been covered in the general charge, is not error. Jones v. Noel, 30 Tenn. App. 184, 204 S. W. (2d) 336; Graham v. Cloar, 30 Tenn. App. 306, 205 S. W. (2d) 764; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Carman v. Huff, 32 Tenn. App. 687, 227 S. W. (2d) 780. And request (7) was properly refused because the request in substance directs the jury to disregard circumstantial evidence favorable to plaintiffs. Under our authorities any material facts may be established by either direct or circumstantial evidence. McMahan v. Tucker, supra.

■ Finally it is insisted that the verdict is excessive because the plaintiffs failed to exercise reasonable care to remedy the situation and alleviate the damage after it was discovered. Plaintiffs admitted that they continued to use the gas after the moisture was discovered and that they were still using it. They said that they had already paid for the range and the refrigerator, but that they still owed for the heaters and the installation, and that they did not have sufficient funds with which to purchase other heating equipment. Though required to exercise reasonable care and diligence to protect themselves from unnecessary loss and, if possible, to minimize or lessen the resulting damages, repeated assurances by the defendant that the condition would be remedied was some justification for plaintiffs' failure to take steps to minimize the loss, so long as it appeared that the defendant would perform.

On the question of plaintiffs' duty to exercise reasonable care, the court instructed the jury as follows:

"If you find that the plaintiffs are entitled to recover, they cannot recover for any damages they sustained after

they knew of the situation complained of and failed to exercise reasonable care to remedy.

* * * * * *

"And further * * * that if you find that the plaintiffs, upon first noticing the alleged excessive moisture, did not use proper means and effort to protect themselves from unnecessary loss or damage, they are entitled to recover only for such damage as, by reasonable endeavor and expense, they could not prevent; and if the plaintiffs failed to do what fair and reasonable prudence required to save themselves from loss and reduce the damages, all that damage which arises from plaintiffs' own negligence or failure to act would be considered too remote for recovery, and you would, and you will allow nothing for that.''

The amount of damages is primarily a jury question and a jury's verdict approved by the trial court is entitled to great weight in this court, in the absence of a showing of fraud or corruption. D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 206 S. W. (2d) 897; Carman v. Huff, supra; Ezell v. Post Sign Co., 30 Tenn. App. 256, 205 S. W. (2d) 13. The law does not require exactness of computation in suits involving questions of damages growing out of contracts. Provident Life & Accident Ins. Co. v. Globe Indemnity Co., 156 Tenn. 571, 3 S. W. (2d) 1057. And damages are allowable where they are not in fact remote or speculative, but are proved to a reasonable certainty. Black v. Love & Amos Coal Co., 30 Tenn. App. 377, 206 S. W. (2d) 432. Plaintiffs sued for the sum of $2,500 and the total damages proved amounted to more than $3,000. Under the proof the jury could have returned a verdict for the full amount sued for. The fact that the verdict was for much less is a strong

indication that the jury considered the foregoing portions of the court's charge in reaching its verdict. Nothing appears to the contrary.

Finding no reversible error, all assignments are accordingly overruled and the judgment below will be affirmed at defendant's costs.

McAmis and Hale, JJ., concur.